No. 64,899

STATE OF KANSAS, *Appellee*, v. ROY E. HUMPHREY, *Appellant.*

(845 P.2d 592)

8

Opinion filed December 11, 1992.

*J. Patrick Lawless, Jr.,* assistant appellate defender, argued the cause, and *Jessica R. Kunen,* chief appellate defender, was with him on the brief for appellant.

*JaLynn Copp,* assistant attorney general, argued the cause, and *Robert T. Stephan,* attorney general, and *Dan C. Riley* and *Lawrence J. Logback,* legal interns, were with her on the brief for appellee.

The opinion of the court was delivered by

HERD, J.: This is a direct appeal by Roy E. Humphrey from his convictions of one count of first-degree murder, K.S.A. 1991 Supp. 21-3401; one count of aggravated assault, K.S.A. 21-3410; two counts of attempted first-degree murder, K.S.A. 1991 Supp. 21-3301 and K.S.A. 1991 Supp. 21-3401; and one count of unlawful possession of a firearm, K.S.A. 1991 Supp. 21-4204.

## FACTS

The day before Thanksgiving, November 1987, Tony Gray and his wife, Tina Gray, arrived in Garden City from San Francisco. They intended to assist Roy E. Humphrey in the manufacture of methamphetamine. Humphrey had paid the Grays' bus fare to Kansas and allowed them to stay at his house. About two weeks later, Tina's stepbrother, Gary McFadden, arrived to assist in the illegal drug operation.

Sandra Bell and her three children lived in a trailer behind Humphrey's house. Bell worked for Humphrey selling cocaine. Humphrey had traded cocaine for a nine millimeter semi-automatic handgun for which Bell had signed the receipt. Humphrey was on parole at the time and, therefore, was not allowed to own a gun. After getting the gun, he carried it with him almost continuously.

Humphrey did not like McFadden and threatened him on a daily basis during December 1987. For example, Humphrey criticized one of Bell's children while the children were decorating a Christmas tree, and McFadden told Humphrey to let the children enjoy decorating the tree. This made Humphrey angry and he pulled out his gun and threatened McFadden. On another

occasion, Humphrey was loading the clip for his gun and noticed one bullet was a different brand than the others. He accused McFadden of sabotaging his gun and announced the unique bullet was for McFadden.

In order to begin the manufacturing of methamphetamine, Tina, using the name Renee Grecco, ordered the necessary chemicals and glassware from Texas. The day the glassware arrived, Tina and Humphrey had been on a run for three days—meaning they had taken drugs in amounts large enough that they had not slept for three days. That afternoon Bell and another woman, Pat Mendivil, were in and out of Humphrey's house. In the evening, Jamie Jones arrived with her five-year-old daughter, Euniece, whose father is Humphrey. Throughout the afternoon and evening, all the adults present were injecting cocaine, drinking liquor, and smoking marijuana. All evening, Humphrey argued with Jones; he slapped her, kicked her, and pointed the gun at her. Jones appeared terrified.

At about 3:00 a.m. on December 22, 1987, Humphrey decided it was time to make the methamphetamine even though they did not have all the necessary chemicals and equipment. Humphrey ordered Tony and Tina at gunpoint to take all the chemicals and glassware out of the bedroom and put them in the kitchen. While this was going on, McFadden entered the house. Tony warned him to stay away from Humphrey. McFadden then went into the living room and sat down. Soon afterward Humphrey pointed his gun at Jones' head and said, "I'm not going to kill—I'm not going to do nothing but beat you, but I'm going to kill them." He then turned and fired once at McFadden, who was a few feet away. The bullet hit McFadden in the head, killing him. At trial, Jones testified she was not scared when Humphrey was holding the gun near her head because she did not believe he would use it.

Humphrey turned the gun toward Tony, who lunged at Humphrey and tried to pin him down. Jones took her daughter and left. Tony released Humphrey, who asked Tina if she wanted him to "kill McFadden again." Humphrey then announced he would have to kill the Grays because they were witnesses. Humphrey made them go outside and walk toward a field behind the house. Tina asked if she could overdose on drugs rather than be shot and Humphrey agreed. While Humphrey was retrieving

cocaine from a pouch he was carrying, Tony was able to get the gun.

Humphrey returned to the house where he fell asleep on the couch, across the room from McFadden's body. The Grays went to Bell's trailer to get her and her children away from the area. Before leaving town, Tina called her sister in Texas to notify her of McFadden's death, and Tina's sister reported the crime to the Garden City Police Department.

Later on that same day, Humphrey wrapped McFadden's body in a curtain and loaded it into a pickup truck parked at his house. Early the following morning, Humphrey moved the body to the back of a borrowed van. With his friend, Jesse James Jones, Humphrey took the body to some sand pits about a half mile from his house and buried it in a shallow grave.

In January 1988, Humphrey was taken into custody on a warrant issued in June 1987 for the sale of cocaine. When Mendivil went to see him in jail on January 17, 1988, Humphrey asked her to kill Jamie Jones with a drug overdose and to take Euniece to the Mexico border and abandon her. Humphrey also told her where to find McFadden's body, directed her on how to draw a map of its location, and asked her to go to Sylvester Guebara and tell him to move the body out of the state. Guebara, however, refused to help, and Mendivil took the map to Michael Utz, a Garden City Police Department investigator. With the information from Mendivil, the police department was able to find McFadden's body.

On May 25, 1988, Humphrey was found not guilty on the sale of cocaine charges. Earlier that month, a preliminary hearing was held on the charges against him arising out of the death of McFadden, in case number 88-CR-66. He was arraigned the following month on a six-count information. That case, however, was dismissed, and the instant case, case number 89-CR-166, was filed February 10, 1989. That information contains the following 10 counts: felony murder while committing aggravated assault, or in the alternative premeditated first-degree murder, K.S.A. 21-3401, a class A felony; aggravated assault against Jamie Jones, K.S.A. 21-3410, a class D felony; aggravated assault against Tina Gray or in the alternative attempted premeditated murder of Tina Gray; attempted premeditated murder of Tony Gray, or in the

alternative aggravated assault of Tony Gray; kidnapping of Tina Gray, K.S.A. 21-3420, a class B felony; kidnapping of Tony Gray; and the unlawful possession of a firearm, K.S.A. 21-4204, a class D felony.

Humphrey's trial began June 19, 1989. Humphrey's attorney argued Humphrey did not intend to shoot McFadden; instead he claimed the killing was accidental. Jamie Jones supported the defendant's claim by testifying she was not aware McFadden was sitting in the chair at the time Humphrey turned and fired the gun. The jury found Humphrey guilty of first-degree murder, one count of aggravated assault, two counts of attempted first-degree murder, and one count of unlawful possession of a firearm.

Other facts will be developed as needed in discussing the issues.

I

First, Humphrey argues the State did not properly charge him because the underlying felony of aggravated assault merged into the charge of felony murder.

Recently, we discussed the felony-murder doctrine and made the following observations:

"The purpose of the felony-murder doctrine is to deter those engaged in felonies from killing negligently or accidentally, and the doctrine should not be extended beyond its rational function which it was designed to serve.

"In order to apply the felony-murder doctrine: (1) the underlying felony must be one which is inherently dangerous to human life; and (2) the elements of the underlying felony must be so distinct from the homicide so as not to be an ingredient of the homicide.

"In determining whether an underlying felony is inherently dangerous to human life so as to justify a charge of felony murder, the elements of the underlying felony should be viewed in the abstract, and the circumstances of the commission of the felony should not be considered in making the determination.

"Time, distance, and the causal relationship between the underlying felony and the killing are factors to be considered in determining whether the killing is a part of the felony, and, therefore, subject to the felony-murder rule." *State v. Prouse*, 244 Kan. 292, Syl. ¶¶ 3-6, 767 P.2d 1308 (1989).

Thus, if a homicide occurs during the commission of an independent, life-threatening felony, the felony-murder statute applies. The merger doctrine, however, prevents the prosecution from charging felony murder and a collateral felony if the only

felonious conduct is the cause of the victim's death. For example, if a defendant commits an aggravated battery which results in the death of the victim, the defendant cannot be charged with felony murder and aggravated battery. 244 Kan. at 296-97.

For support, Humphrey cites *State v. Leonard*, 248 Kan. 427, 807 P.2d 81 (1991). In *Leonard*, the defendant drove through a parking lot with a semi-truck and killed a man. The State charged the defendant with first-degree murder committed while perpetrating the felony of aggravated assault against numerous individuals other than the ultimate victim. The trial court dismissed the felony-murder charge on the grounds that the underlying felony of aggravated assault merged with the felony murder. We affirmed the trial court and stated: "Leonard's *one act* of driving the semi-truck through the crowd is the basis for both charges. This one act is not separated in time and distance. The one act caused the killing. Because there was only one act, the elements of aggravated assault are not distinct from the homicide. The aggravated assault charges merged with the felony-murder charge." 248 Kan. at 431.

The State contends the shooting did not occur at the same time Humphrey was making his general threat to everyone in the house. Humphrey was specifically threatening Jamie Jones by pointing a loaded gun at her head. He then turned and fired the single shot that hit McFadden. Therefore, the State argues, two acts separated in time and distance were involved—the aggravated assault of Jamie Jones and the homicide of McFadden. Because there were two acts, the elements of aggravated assault are distinct from McFadden's homicide.

We agree and hold the aggravated assault of Jamie Jones did not merge with the killing of McFadden. Thus, this issue is without merit.

## II

Next, Humphrey claims the trial court violated his Sixth and Fourteenth Amendment rights when it refused to allow him to call an expert witness because he had invoked his Fifth Amendment right not to testify on his own behalf.

In September 1988, Humphrey was interviewed by Dr. Herbert C. Modlin, a psychiatrist at the Menninger Clinic. At that

time, 88-CR-66 was pending against Humphrey, and his competency to stand trial as well as his sanity on the date of the alleged crimes had been brought into issue. Dr. Modlin prepared a report which stated in part:

"Mental and emotional changes from sleep [deprivation] of 100 hours or more are usually dramatic and incapacitating. They include fatigue, irritability, feelings of persecution, poor concentration, misperceptions (hallucinations), and disorientation. . . .

. . . .

"The data support Mr. H's contention that the shooting was accidental. His paranoid suspicions did not include anyone in the house including Gary [McFadden]. There is suggestive evidence that the gun could have gone off accidentally because of Mr. H's poor motor coordination. Just before 12/22 he started drinking whiskey in the hope that it would control his jitteriness, but it probably made things worse."

After Dr. Modlin completed this report, he was provided with transcripts of the preliminary hearings as well as the deposition of Tony Gray and a statement made by Tina Gray.

At trial, Humphrey attempted to call Dr. Modlin as a witness in his case in chief. In a hearing outside the presence of the jury, Humphrey's attorney stated Humphrey would be willing to take the stand, but his testimony on direct examination would be limited to a few questions that could be answered with yes or no. Thus, Humphrey would be available for cross-examination but only as to the limited areas opened on direct. The trial court acknowledged Humphrey's right to refuse to testify; however, the judge stated the questions on direct would not limit cross-examination into other areas. Ultimately, the trial court ruled that if Dr. Modlin was called as a witness and testified to the contents of his September 1988 report, Humphrey would have to be available for cross-examination on whatever Humphrey told Dr. Modlin which assisted Modlin in arriving at his expert opinion.

Humphrey contends the exclusion of Dr. Modlin's testimony violated his right under the Sixth and Fourteenth Amendments to present a defense. See *California v. Trombetta*, 467 U.S. 479, 485, 81 L. Ed. 2d 413, 104 S. Ct. 2528 (1984); *Washington v. Texas*, 388 U.S. 14, 18-19, 18 L. Ed. 2d 1019, 87 S. Ct. 1920 (1967).

The State counters Humphrey's argument by first pointing out the admission of evidence lies within the sound discretion of the

trial court, subject to exclusionary rules. *State v. Carmichael,* 240 Kan. 149, 157, 727 P.2d 918 (1986). "The admissibility of expert testimony lies within the sound discretion of the trial court and its determination will not be reversed on appeal absent a showing of an abuse of discretion." *State v. Stuckey,* 242 Kan. 204, Syl. ¶ 1, 747 P.2d 137 (1987). Second, K.S.A. 60-456 governs the admissibility of expert opinion evidence. That statute states in pertinent part:

"(b) If the witness is testifying as an expert, testimony of the witness in the form of opinions or inferences is limited to such opinions as the judge finds are (1) based on facts or data perceived by or personally known or made known to the witness at the hearing and (2) within the scope of the special knowledge, skill, experience or training possessed by the witness.

. . . .

"(d) Testimony in the form of opinions or inferences otherwise admissible under this article is not objectionable because it embraces the ultimate issue or issues to be decided by the trier of fact."

In *State v. Irons,* 250 Kan. 302, Syl. ¶ 2, 827 P.2d 722 (1992), we stated it is fundamental to a fair trial that the accused be afforded the opportunity to present his or her theory of defense to the charge so the jury may properly weigh the evidence and reach its verdict. Here, Humphrey wished to present expert testimony. The trial court, however, would not allow Dr. Modlin's testimony because it concluded Dr. Modlin's testimony or opinion was based upon hearsay. We do not agree.

"Evidence of a statement which is made other than by a witness while testifying at the hearing, offered to prove the truth of the matter stated, is hearsay evidence." K.S.A. 1991 Supp. 60-460. Hearsay evidence is inadmissible except under statutory exceptions. If Dr. Modlin had been allowed to testify, he would have been called upon to repeat the statements Humphrey made to him during his examination of Humphrey. Modlin's testimony as to Humphrey's statements during trial would not be offered to prove the truth of the matter stated. Instead, Humphrey's statements would be offered to establish the basis of Modlin's expert opinion. Dr. Modlin, as a trained psychiatrist, could use Humphrey's statements with other facts and his own expertise to arrive at an opinion of Humphrey's mental state at the time the shooting occurred. Thus, Modlin's testimony would not have been hearsay.

Humphrey's statements are part of the data perceived by or made known to Dr. Modlin and meet the requirements of K.S.A. 60-456(b).

Our decision is supported by *United States v. Baird,* 414 F.2d 700 (2d Cir. 1969), *cert. denied* 396 U.S. 1005 (1970), in which the court stated:

> " 'It is obvious, even to the layman, that in all probability a psychiatrist would require more than a mere physical examination of a defendant in order to reach a conclusion of his sanity or insanity. The very nature of the psychiatric study would seem to call for utterances, or answers through conversation with the alleged incompetent. The psychiatric interview is the basic diagnostic tool.'
>
> . . . .
>
> " 'There seems to be a tendency elsewhere in insanity cases to allow the defense psychiatrist to recount the full history obtained from the defendant regardless of its hearsay or self-serving quality, so long as the doctor regards it as essential to the formulation of his expert opinion. If he so regards the history, the test of admissibility is satisfied. The thesis is that such conversations with and statements by the defendant, whether or not they relate to the crime itself, are verbal acts; circumstantial evidence for or against the claim of insanity. They do not come in as evidence of the truth of the facts asserted but rather, and only, as part of the means employed by the doctor in testing the accused's rationality, mental organization and coherence. They are object-like factors used to ascertain mental abnormality or the reverse.' [Citation omitted.]
>
> "The statements which the defendant makes to the psychiatrist may be as vital for diagnosis as an x-ray or a blood test may be to a physician in another context; this was the theory of admissibility upon which appellant relied in having his expert witnesses recount otherwise inadmissible self-serving, hearsay statements; and, even though they are verbal, they may be considered as 'real or physical evidence' rather than as 'communications' or 'testimony' within the meaning of *Schmerber v. California,* 384 U.S. 757, 763-64, 86 S. Ct. 1826, 16 L. Ed. 2d 908 (1966) . . . ." 414 F.2d at 708-09 (quoting *State v. Whitlow,* 45 N.J. 3, 210 A.2d 763 [1965]).

The State argues *State v. Hobson,* 234 Kan. 133, 161, 671 P.2d 1365 (1983), supports the district court's ruling in this case. In *Hobson,* we held expert testimony was properly excluded because it embraced the ultimate issue to be determined by the jury. Here, the expert testimony of Dr. Modlin was proffered

for the limited purpose of explaining to the jury that use of drugs, alcohol, and loss of sleep could have so diminished Humphrey's capacity he could not have had the specific intent to commit premeditated murder. Thus, this issue is distinguishable from and not controlled by *Hobson*.

We hold it was error for the trial court to refuse to allow Humphrey to call Dr. Modlin because Humphrey had asserted his Fifth Amendment right to refuse to testify in his own behalf. The trial court denied Humphrey his right to present his theory of defense; therefore, this case must be reversed and remanded for a new trial. On retrial, if Dr. Modlin is called to testify, he is subject to cross-examination on any information upon which he based his opinion. See *State v. Pyle*, 216 Kan. 423, 442, 532 P.2d 1309 (1975).

### III

Humphrey argues the trial court denied him his Sixth Amendment right to effective assistance of counsel. First, Humphrey contends the trial court denied his right to effective assistance of counsel when it restricted his attorney's ability to elicit testimony from Dr. Modlin.

In light of our holding on issue II this contention needs no further discussion.

Humphrey also claims his right to effective assistance of counsel was violated by the trial court when it restricted his attorney's ability to cross-examine Pat Mendivil. At trial, Humphrey attempted to cross-examine Mendivil as to whether she had received immunity from the State in exchange for her testimony. On direct examination by the State the following exchange took place:

"Q: Now, at this time, ma'am, were you working for the police?
"A: No.
"Q: Okay. Did the police send you up there to get that map?
"A: No.
"Q: Prior to this were you working for the police?
"A: No.
"Q: Okay. You been granted immunity or any type of deal for your testimony in this case?
"A: No."

The following exchange took place on cross-examination:

"Q: Pat, you stated on direct that you've not been granted any immunity—
"A: Immunity, no.
"Q: —for you to testify today. Were you aware that possession of coke—
    "MR. HOUGH: Objection; this is irrelevant.
    "THE COURT: Objection sustained.
"Q: Are you—are you presently working for the police?
    "MR. HOUGH: Objection; this is irrelevant, it's immaterial.
    "THE COURT: Objection sustained.
    "MR. LEVY: Your honor, I have this witness under subpoena. I have no cross—no further cross."

The Confrontation Clause of the Sixth Amendment affords an accused the right to cross-examination. The United States Supreme Court has "recognized that the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." *Davis v. Alaska,* 415 U.S. 308, 316-17, 39 L. Ed. 2d 347, 94 S. Ct. 1105 (1974). "[T]he right to the effective assistance of counsel is recognized not for its own sake, but because of the effect it has on the ability of the accused to receive a fair trial. Absent some effect of challenged conduct on the reliability of the trial process, the Sixth Amendment guarantee is generally not implicated." *United States v. Cronic,* 466 U.S. 648, 658, 80 L. Ed. 2d 657, 104 S. Ct. 2039 (1984). In certain circumstances, however, the denial of effective cross-examination amounts to constitutional error of such magnitude that no showing of prejudice is required for reversal. *Davis,* 415 U.S. at 318.

Humphrey argues Mendivil's testimony was critical. She testified that Humphrey acknowledged the killing, wanted Jamie Jones killed, and asked Mendivil to assist in getting the body moved. Humphrey's attorney asked Mendivil if she had been granted immunity and she answered, "No." On cross-examination, the trial court did not allow Mendivil to answer the question of whether she was presently working for the police.

Humphrey should have been afforded the opportunity to vigorously test Mendivil's credibility by cross-examining her about her relationship with the police. This might have led to a disclosure of an implied threat made by Utz. Rather than this error being ineffective assistance of counsel, we find it is trial court error which rendered trial counsel ineffective through no fault of counsel.

## IV

Humphrey next argues the trial court committed judicial misconduct and violated his rights when it heard statements from one of the State's witnesses in camera. Humphrey raises three arguments. First, the trial court violated his right pursuant to the Sixth Amendment and K.S.A. 22-3405 to be present at a critical stage of the trial. Second, Humphrey contends the trial court violated his Sixth Amendment right to effectively confront and cross-examine witnesses at trial. Third, the trial court erred in denying Humphrey's motions for mistrial.

Each of these arguments will be addressed after a recitation of the pertinent facts.

At trial, the State called Pat Mendivil in its case in chief. During cross-examination, Mendivil testified that the police had not threatened her in any way to give them information. Humphrey's attorney then attempted to question her about threats by the police to take her baby away, but the court sustained a series of objections by the State. Humphrey's attorney also asked Mendivil if she was presently working for the police. The State objected on the grounds the question was irrelevant and immaterial. The trial court sustained the State's objection.

After the close of the State's case, a private attorney, Charles E. Owen, II, appeared in chambers with Mendivil. Neither the State, Humphrey's attorney, nor Humphrey were present at this conference. Mendivil waived any attorney-client privilege regarding any statements she made to Owen, and Owen informed the trial judge that Mendivil might have perjured herself when responding to at least two questions. Specifically, Mendivil had testified that no threats had been made to secure her testimony, when in fact Detective Utz had implied that bad check charges could be brought against her if she did not testify. In addition, the State's attorney specifically told Mendivil not to testify that Humphrey had been on drugs for two or three days prior to the shooting.

The trial court appointed counsel for Mendivil so she could consult with an attorney about whether to approach Humphrey's attorney or the State before she was called in Humphrey's case in chief. The trial court reserved any ruling on whether the information should be disclosed to Humphrey or the State. The

court, however, stated, "It will ultimately be disclosed because I have to disclose. It's just a question of what stage of the proceedings I disclose what happened in here."

The following day, Humphrey proceeded with his case but did not call Mendivil as a witness. After Humphrey had rested his case and the State had called its rebuttal witnesses, the trial court held a hearing, outside the presence of the jury, with the State's attorney, Humphrey, Humphrey's attorney, Mendivil, and Mendivil's attorney. The trial judge explained what had occurred during the in camera hearing. At this hearing, Mendivil stated that the State's attorney had not specifically told her to testify that Humphrey had not been taking drugs. Instead, he had made her feel that was the testimony he wanted. The trial judge then explained that he had reviewed Mendivil's trial testimony with his court reporter. The court stated:

"And even though [Humphrey's attorney] may have asked his ultimate question, were you threatened, no, in relation to all the other of your testimony that I received at the trial of this matter it doesn't reflect or show me that it would have any bearing or any change upon your testimony, because the thrust of your testimony if you'll recall had to do with the map and you went to see Mr. Utz. He didn't call you. You went to see him."

Following a discussion of Mendivil's testimony, Humphrey's attorney moved for a mistrial. The court took the motion under advisement. The next day, Humphrey again moved for a mistrial. The trial judge stated he felt he was correct in not revealing the in camera conference with Mendivil

"because in my opinion she had not yet perjured herself to the point of any disadvantage would result to Mr. Humphrey. She was under subpoena and it was only then that she had in fact been called by [Humphrey's attorney], and if I was under the impression that she may have perjured herself I would have made a disclosure and subjected her to further examination upon questions asked in cross-examination.

"Just because she made a statement had she been threatened, said no, does not preclude defense counsel from asking about any behavior of Tony Gray, Tina Gray, Roy Humphrey, Gary McFadden, Sandra Bell or any other individuals who might have been in and about those premises on December 21 and 22, 1987; and for the Court to presume that this precluded the defendant the right to ask those questions would be in my opinion error."

The trial court continued to reserve any ruling on the motion for mistrial.

Humphrey claims the ex parte, in camera hearing with Mendivil and the trial court's failure to disclose her possible misconduct violated his right to due process pursuant to the Fifth and Fourteenth Amendments and his right to be present at a critical stage of trial as guaranteed by the Sixth Amendment and stated in K.S.A. 22-3405. According to K.S.A. 22-3405(1) "[t]he defendant in a felony case shall be present at the arraignment, at every stage of the trial including the impaneling of the jury and the return of the verdict, and at the imposition of sentence, except as otherwise provided by law." Closely related to this argument is Humphrey's contention that his Sixth Amendment right of confrontation was also violated.

Although ex parte communications between a trial judge and a witness in a criminal trial are not per se violations of a defendant's due process rights, they create the appearance of partiality in a judicial proceeding and should be avoided. *Grieco v. Meachum*, 533 F.2d 713, 719 (1st Cir.), *cert. denied* 429 U.S. 858 (1976). The importance of the defendant's presence is also reflected in Canon 3A (4) of the Code of Judicial Conduct, which provides in part:

"A judge should accord to every person who is legally interested in a proceeding, or his lawyer, full right to be heard according to law, and, except as authorized by law, neither initiate nor consider *ex parte* or other communications concerning a pending or impending proceeding." 1992 Kan. Ct. R. Annot. 348.

We, however, have stated:

"In general a defendant's statutory and constitutional rights to be present are violated only if the defendant is absent when the jury is hearing the case or when he is prevented from attending such other proceedings where his presence is essential to a fair and just determination of a substantial issue." *State v. Turbeville*, 235 Kan. 993, 1002, 686 P.2d 138 (1984).

The State has an affirmative duty to disclose to the court and opposing counsel irregularities at trial which prejudice the rights of the defendant. *State v. Cady*, 248 Kan. 743, 759, 811 P.2d 1130 (1991). The prosecution has a duty to disclose evidence that the defense could use to impeach the State's witnesses by showing bias or interest. *United States v. Bagley*, 473 U.S. 667, 676, 87 L. Ed. 2d 481, 105 S. Ct. 3375 (1985). Although these cases involve the prosecution withholding evidence favorable to an ac-

cused, the trial court must follow the same rules. In fact, the trial court is held to an even higher standard because of its duty to remain impartial. See Canon 3 of the Code of Judicial Conduct (1992 Kan. Ct. R. Annot. 348).

The Confrontation Clause of the Sixth Amendment provides, "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." This right of confrontation has been applied to the States through the Fourteenth Amendment. *Pointer v. Texas,* 380 U.S. 400, 403, 13 L. Ed. 923, 85 S. Ct. 1065 (1965). The primary purpose of the Confrontation Clause is to give the accused the opportunity for cross-examination to attack the credibility of the State's witnesses. *State v. Johnson,* 240 Kan. 326, 329, 729 P.2d 1169 (1986), *cert. denied* 481 U.S. 1071 (1987) (citing *Delaware v. Van Arsdall,* 475 U.S. 673, 89 L. Ed. 2d 674, 683, 106 S. Ct. 1431 [1986]); *Davis v. Alaska,* 415 U.S. 308, 315, 39 L. Ed. 2d 347, 94 S. Ct. 1105 [1974]). "By allowing criminal defendants to cross-examine witnesses and by allowing the trier of fact to evaluate the credibility of those witnesses, the right of confrontation promotes both the reliability of criminal trials and the perception of fairness in our criminal justice system." *Myatt v. Hannigan,* 910 F.2d 680, 682 (10th Cir. 1990) (citing *Lee v. Illinois,* 476 U.S. 530, 540, 90 L. Ed. 2d 514, 106 S. Ct. 2056 [1986]).

In the case before us, upon being informed of the ex parte, in camera hearing, Humphrey's attorney explained he had made a decision not to call Mendivil as a defense witness because she had testified Detective Utz had never threatened her. Had he been fully informed of the evidence Mendivil revealed in the ex parte hearing, Humphrey's attorney could have called her to testify in Humphrey's case in chief. Thus, the trial court's decision not to disclose this information until after the defense had rested could have affected Humphrey's trial strategy.

We hold the trial court violated Humphrey's Sixth Amendment right to confrontation by withholding impeachment evidence and thereby interfered with Humphrey's ability to effectively cross-examine Mendivil. Furthermore, the trial court should not have heard Mendivil's statements in camera without having both the State and Humphrey present.

Finally, Humphrey contends the trial court erred when it denied his motions for mistrial. A trial court may order a mistrial if "[p]rejudicial conduct, in or outside the courtroom, makes it impossible to proceed with the trial without injustice to either the defendant or the prosecution." K.S.A. 22-3423(1)(c). In light of our decision regarding the trial court's violation of Humphrey's Sixth Amendment rights, we agree that the court erred in denying Humphrey's motion for a mistrial.

V

Humphrey claims the trial court erred when it failed to instruct the jury on the lesser included offense of involuntary manslaughter. Involuntary manslaughter is defined as "the unlawful killing of a human being, without malice, which is done unintentionally in the wanton commission of an unlawful act not amounting to felony, or in the commission of a lawful act in an unlawful or wanton manner." K.S.A. 21-3404(a).

At trial, Humphrey argued for an instruction on involuntary manslaughter based upon his claim that the killing was unintentional and occurred during the commission of a lawful act in a wanton manner; that lawful act being Humphrey removing the gun from Jamie Jones' face. The court, however, responded:

"The mere fact that one puts down a gun does not constitute a lawful act. You have to look at all the circumstances surrounding everything leading up to that particular point and to say that one is putting a gun down constitutes a lawful act in my opinion completely abrogates the intent of the statute and the intent of the law as mandated by our legislature."

A trial court has a duty to instruct the jury on all lesser included offenses where there is evidence upon which the accused might reasonably be convicted of the lesser offense. K.S.A. 21-3107(3). In *State v. Seelke*, 221 Kan. 672, 561 P.2d 869 (1977), we thoroughly discussed murder cases in which the issue of whether an instruction on the lesser included offense of involuntary manslaughter had been raised. We pointed out that "[i]n some cases the homicide occurred under factual circumstances where there was no evidence of provocation or explanation or excuse and the evidence established that the defendant was either guilty of murder or nothing at all." 221 Kan. at 677.

This case has a variable based upon the court's ruling prohibiting the testimony of Dr. Modlin. At trial, Humphrey claimed the killing was accidental. On appeal, there is a dispute over whether he raised the defense of voluntary intoxication at trial. Clearly Humphrey intended to raise the issue of intoxication, drugs, and sleep loss at trial through the testimony of Dr. Modlin, which was improperly ruled inadmissible. The defense of voluntary intoxication requires proof that the intoxication was to such an extent that the defendant is utterly devoid of consciousness or awareness of what he is doing. *State v. Falke,* 237 Kan. 668, 683-84, 703 P.2d 1362 (1985). If Humphrey's intoxication did not affect his ability to reason, to plan, to recall, or to exercise his motor skills, he has not met the standard for the voluntary intoxication defense. On retrial, Humphrey is entitled to an instruction on involuntary manslaughter if Dr. Modlin's testimony lays the appropriate foundation.

## VI

Humphrey claims the trial court erred when it admitted into evidence a statement he made, without first holding a hearing on the voluntariness of the statement pursuant to *Jackson v. Denno,* 378 U.S. 368, 12 L. Ed. 2d 908, 84 S. Ct. 1774 (1964).

On February 8, 1988, Humphrey was taken from the jail to the law enforcement center courtroom where a bond hearing was held in connection with the charges in this case. The magistrate set Humphrey's bond at $1 million. As Humphrey was leaving the courtroom, a deputy sheriff overheard Humphrey state, "A million dollars for one. I suppose if I'd killed three I could get out on bond." When the State attempted to bring in this testimony through the deputy sheriff, Humphrey objected because there had been no *Jackson v. Denno* hearing. The State proffered that Humphrey was not in custody or in any way being interrogated and that the statement was unsolicited. The trial court overruled Humphrey's objection and allowed the deputy sheriff to testify. The deputy sheriff assumed Humphrey was referring to a Wichita homicide case in which the defendant was charged with killing three people. In *Jackson,* the United States Supreme Court stated:

"It is now axiomatic that a defendant in a criminal case is deprived of due process of law if his conviction is founded, in whole or in part, upon an involuntary confession, without regard for the truth or falsity of the confession, [citation omitted], and even though there is ample evidence aside from the confession to support the conviction. [Citations omitted.]" 378 U.S. at 376.

We find the statement made by Humphrey was not a confession and, therefore, does not fall under the *Jackson v. Denno* rule. Humphrey has never claimed he did not kill McFadden; instead, he has claimed the killing was accidental. Thus, the issue in this case has been whether Humphrey was legally culpable for the death of McFadden and not whether Humphrey killed McFadden.

We hold the trial court did not err in admitting Humphrey's statement through the testimony of the deputy sheriff.

## VII

Humphrey argues the trial court erred in ruling his trial attorney was effective even though the attorney did not request an instruction on voluntary intoxication.

Humphrey docketed his appeal in March 1990. On November 13, 1990, Humphrey filed a motion requesting the case be temporarily remanded to the district court in order to consider his claim of ineffective assistance of counsel. This motion was granted, and the district court conducted a hearing on Humphrey's claim of ineffective assistance of counsel on October 14, 1991. The district court did not order Humphrey to be transported in order to attend this hearing and, therefore, heard Humphrey's arguments through his court-appointed counsel. The attorneys based their arguments upon preliminary hearing and trial transcripts, and no new evidence was presented. At that hearing, the district court stated:

"First and foremost, the defense was not voluntary intoxication. I sat through this trial. Sure there was use of cocaine. Sure there was use of alcohol. Sure there was use of marijuana. Sure there was deprivation of sleep. But the defense was not voluntary intoxication. The defense was I could not form the requisite intent to commit the crime of first-degree murder. . . . I could not form the requisite intent to commit the crime of attempted first-degree murder. That was not the defense. The defense was straight out that I did not intend to kill Gary McFadden. Gary McFadden died as a result of an accident, period."

Ultimately, the trial court denied Humphrey's motion for a new trial.

The standard for determining ineffective assistance of counsel was established by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984). In *Strickland*, the Court stated:

"First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." 466 U.S. at 687.

In *Chamberlain v. State*, 236 Kan. 650, 656-57, 694 P.2d 468 (1985), we adopted the *Strickland* two-prong test. Before we consider a defendant's argument of ineffective assistance of counsel, the trial court must consider the argument and rule upon it. The appellate court places much deference upon the findings of the trial judge who saw all the proceedings first-hand as they happened. *Chamberlain*, 236 Kan. at 659-60. In the case before us, the trial court found Humphrey's trial attorney did not fall below an objective standard of reasonableness. The trial court further found Humphrey's trial attorney's tactics and techniques had not so prejudiced Humphrey that he did not get a fair and impartial trial.

We agree. Thus, we hold the trial court did not err in ruling Humphrey's trial attorney was not ineffective. The failure to request an instruction on voluntary intoxication was not the fault of trial counsel. That failure resulted from Dr. Modlin's testimony being barred.

## VIII

Humphrey argues the trial court denied him his right to due process when it refused to transport him to the hearing on his ineffective assistance of counsel claim. At the beginning of that hearing, the trial judge stated he could find no reason or basis for Humphrey to be present and pointed out the motion claiming ineffective assistance of counsel did not require a "full-blown evidentiary hearing as to any newly discovered matters." Hum-

phrey's attorney objected to this ruling. He argued Humphrey was familiar with his case and his presence could have been beneficial, especially because Humphrey had a different attorney at the hearing than he had had at trial.

A defendant's right to be present does not extend to proceedings before the court involving matters of law. *State v. Garcia,* 233 Kan. 589, 595, 664 P.2d 1343 (1983). It is the majority view throughout this country that the presence of a convicted defendant is not required at a hearing on a postverdict motion for a new trial. "The rationale of the majority rule is that the trial ends when a verdict has been rendered, that any right which an accused may have to be present at proceedings following indictment continues only during the pendency of the trial, and that a defendant, once convicted, cannot expect to be present at postconviction motions." *State v. Bryant,* 227 Kan. 385, 391, 607 P.2d 66 (1980).

We find the trial court did not abuse its discretion when it refused to transport Humphrey to the hearing on his ineffective assistance of counsel claim.

IX

Humphrey contends the trial court erred when it failed to preserve for review the closing arguments at his trial. Humphrey argues that by the court's not preserving the closing arguments, he was denied his due process right to effective assistance of counsel on appeal and meaningful review of his claims, as guaranteed by the due process clause of the Fourteenth Amendment.

Following the instructions conference between the trial court and counsel, the following exchange occurred.

"THE COURT: Okay. May we enter into the usual stipulation that closing arguments will not be on the record unless there is a statement made by counsel and an objection? The Court will then dictate into the record the statement made by the attorney, the objection and the Court's ruling.

"MR. HOUGH: Sufficient with the State, Your Honor.

"MR. LEVY: Be fine, Your Honor."

Thus, closing statements were not recorded and are not available for review on appeal.

For support, Humphrey cites Supreme Court Rule 3.03 (1991 Kan. Ct. R. Annot. 14-15), which stated in pertinent part:

"When an appeal is taken in a case in which any evidentiary hearing was held, it shall be the duty of the appellant to order a transcript of such hearing within ten (10) days of the filing of the notice of appeal. . . . In a criminal case, the transcript shall include the trial, the instructions conference, *closing arguments of counsel,* and any hearing on a motion for a new trial." (Emphasis added.)

Rule 3.03, however, was amended effective August 30, 1990. At the time of the trial herein, the rule did not contain the requirement that a criminal case's record on appeal include a transcript of closing arguments. See 1989 Kan. Ct. R. Annot. 15-16.

In view of the fact the State and Humphrey agreed not to make a record of the closing arguments and that the applicable version of Rule 3.03 did not require a transcript of closing arguments to be included in the record on appeal, we find the trial court did not err when it failed to preserve the closing arguments of Humphrey's trial.

Our decision here is based upon Supreme Court Rule 3.03 in effect at the time of Humphrey's trial and does not contradict our statements in *State v. Lumbrera,* 252 Kan. 54, 845 P.2d 609 (1992). In *Lumbrera* we discuss the most recent amendment to Supreme Court Rule 3.03, effective October 9, 1992. There, we acknowledge the importance of closing arguments, particularly in criminal cases, and state they should be of record.

## X

In addition to the brief filed by the appellate defender's office on behalf of Humphrey, Humphrey filed his own pro se brief in which he argues that the trial court lacked jurisdiction over him. First, Humphrey argues the trial court lacked jurisdiction over him because the State violated the speedy trial act, K.S.A. 22-3402. This argument is based upon Humphrey's allegation that he was held in custody, awaiting trial, more than 90 days when the time chargeable to the State in the original case, 88-CR-66, is added to the time chargeable to the State in the current case, 89-CR-166.

We cannot consider this argument because the Finney County District Court file for case number 88-CR-66 has not been made a part of the record on appeal. Thus, Humphrey has failed to meet his burden of providing a sufficient record to show the trial

court committed prejudicial error. See *State v. Blackmore,* 249 Kan. 668, 670, 822 P.2d 49 (1991). We hold this issue is without merit.

Humphrey also claims the trial court lacked jurisdiction because he was improperly charged. Humphrey bases this argument upon two theories. The first theory is that the charges of attempted premeditated murder of Tony and Tina Gray, counts four and seven, and in the alternative, aggravated assault against Tina and Tony Gray, counts five and eight, are duplicitous or multiplicitous. Humphrey's second theory is that the information charging attempted premeditated murder is fatally defective and void. The information in pertinent part states: "[Humphrey] unlawfully, feloniously and willfully [committed] an overt act towards the perpetration of the crime of Premeditated Murder of Tina [Gray] on 12-22-87 as defined by Section 21-3401 K.S.A. with the intent to commit said crime, but failed in the perpetration thereof." Humphrey asserts "[t]his information does not state what the overt act was nor does the information state why or how there was a failure in the perpetration thereof."

We find Humphrey's claims of duplicity or multiplicity and that the information is fatally defective and void are without merit.

## XI

Humphrey argues the trial court erred in not giving a limiting jury instruction in response to the introduction of K.S.A. 60-455 evidence. Specifically, Humphrey claims the testimony of De Ann Rowland, a Federal Express employee, and Bruce Mellor, a KBI agent, introduced evidence of specific criminal conduct and, therefore, a limiting instruction should have been given. Rowland testified that she observed Humphrey and Tina Gray attempt to send cash via Federal Express, which is against Federal Express policy. Mellor testified he was contacted by Rowland because she was suspicious about Humphrey and Tina Gray attempting to send cash. When the shipment of glassware arrived at the Federal Express office, Rowland again contacted Mellor. Mellor then went to the Federal Express office and took photographs of the two sealed packages which had arrived.

We find Rowland and Mellor's testimony does not fall under K.S.A. 60-455. They did not testify that Humphrey had "com-

mitted a crime or civil wrong on a specified occasion." Instead, they testified that he and Tina Gray had *attempted* to send cash via Federal Express, which is not against the law, but merely against Federal Express policy.

We find no error.

## XII

Humphrey's final issue is that the trial court erred in denying his motion for a mistrial based upon prosecutorial misconduct. Humphrey makes three arguments to support his claim. First, he contends the State's attorney committed prosecutorial misconduct when he indicated to Mendivil that she should testify that Humphrey had not been drinking or doing drugs prior to the shooting. Next, Humphrey claims Tony Gray's testimony that Humphrey had made the statement, "This bullet is for Gary," was false and the State's attorney had to have known it was false. Finally, Humphrey argues he was denied his right to effectively cross-examine Tony and Tina Gray, and this denial is a product of prosecutorial misconduct. The alleged misconduct is that the prosecutor gave Tony and Tina Gray copies of their prior testimony from the May 1988 preliminary hearing, thereby allowing the Grays "to read and keep" their prior sworn testimony.

Mendivil testified the State's attorney had not told her to lie but had made her feel he wanted certain testimony. There is no evidence in the record on appeal that Tony Gray's statement regarding the bullet for Gary is false or that the State's attorney knew it was false. Additionally, it is not improper for a prosecutor or any other attorney to allow witnesses to refresh memory by reading their prior sworn testimony.

We hold the trial court did not err in denying Humphrey's motion for a mistrial based upon prosecutorial misconduct.

The judgment of the trial court is reversed, and this case is remanded for a new trial.