No. 68,832

STATE OF KANSAS, *Appellee*, v. WILLIE J. BOWEN, *Appellant*.

(867 P.2d 1024)

Opinion filed January 25, 1994,

*Benjamin C. Wood*, special assistant appellate defender, of Lawrence, argued the cause, and *Jessica R. Kunen*, chief appellate defender, of Topeka, was with him on the brief for appellant.

*Debra S. Byrd*, assistant district attorney, argued the cause, and *Nola Foulston*, district attorney, and *Robert T. Stephan*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

SIX, J.: This first-degree murder case considers: (1) whether the prosecutor violated the trial court's order in limine on evidence of gang membership; (2) alleged abuse of trial court discretion in: (a) refusing to strike a police officer's testimony; (b) refusing to grant the defendant's motion for a mistrial when two jurors indicated that they had seen a newspaper article related to the trial; and (c) striking and prohibiting further cross-examination concerning the probationary status of an identification witness; (3) alleged error in refusing to use the defendant's requested jury instruction on involuntary manslaughter; and (4) sufficiency of the evidence. Defendant abandoned, at oral argument, his claim that an exhibit introduced through the State's firearms expert was error.

Defendant Willie J. Bowen appeals from his convictions of one count of first-degree murder and one count of aggravated battery. K.S.A. 1992 Supp. 21-3401 and K.S.A. 21-3414(c). Our jurisdiction is under K.S.A. 1992 Supp. 22-3601(b)(1) (defendant convicted of a class A felony or a maximum sentence of life imprisonment imposed).

We find that the trial court's limitation on Bowen's cross-examination of an identification witness was harmless error. We find no error on the remaining issues and affirm.

## Facts

Because sufficiency of the evidence is an issue, we set out the facts in detail. At approximately 9:50 p.m. on January 21, 1992, Kent McCray was driving on Stadium Street in Wichita when he was flagged down by Lena Summers. Summers opened the passenger door and asked McCray whether he was looking for a date. McCray replied that he thought she had him mixed up with someone else and instructed her to close the door. According to McCray, after Summers closed the door "all hell broke loose."

McCray heard a succession of at least five shots. He was hit above the eye. McCray recalled seeing a blue flash between two buildings on the passenger side of his car. Summers was shot and killed.

Marcia Redd, a longtime friend of Summers, watched the evening's events from the front door of a house located in the 2500 block on Stadium Street. The house was owned by Robert Herrell, a/k/a Cadillac Bob. Redd had been staying at the house for a couple of days. Summers came over to the house just before dark. When Summers first arrived, she and Redd were outside and it was raining. Redd observed Summers approach two cars. One was red and white. Redd heard the gunshots approximately 10 to 15 minutes after Summers had approached the red and white car. Redd had seen two African-American men in the same car around 4:00 or 4:30 p.m. She observed the man on the passenger side of the car talking with people who were standing in the yard at Cadillac Bob's house. Later that evening, Redd noticed that Summers appeared to have spoken to someone on the passenger side of the red and white car just before her death. Redd could not discern the race or sex of the passenger Summers encountered in the car that night.

According to Redd, Summers came back to the porch and the two discussed Summers' interaction with the passengers in the car. Redd reasoned that the passengers had been asking for a friend of Cadillac Bob's named Andrew who had argued with the persons in the red and white car that afternoon. Summers agreed with Redd. Redd went into the house. When Redd returned, she wondered why Summers was taking so long to come inside because it was misting. Redd looked out the door and saw Summers talking with a man in a blue car. As she was watching Summers, she heard a "pop" sound. She stuck her head out the door. Redd observed a man standing at the side of the house with a long gun. She saw the man shoot at the car, fatally injuring Summers. Redd said that she must have made some noise because the man started shooting at the house. Redd fell to the floor and crawled back in the house as the man continued to fire. At trial, Redd testified that Bowen was the man she had seen shooting.

Michael Calhoun, age 12, was playing with a football outside with his friends Roger Britt and Cornelius Scales. Michael saw

Bowen, who was known to Michael as "Bujo", and another African-American male get out of a maroon and white car and walk through a field to Cadillac Bob's house. Michael lived with his mother and two sisters in a house behind Cadillac Bob's house. Michael testified that Bowen was carrying a gun. He saw Bowen, who was standing at the side of Cadillac Bob's house, pull out a gun and start shooting at the blue car Summers was leaning against. Bowen ran into the yard and started shooting at the house. Michael was standing on the other side of the house. Michael said that Bowen went back to the car and drove off.

When Michael was interviewed by police officers, he did not identify the name of the shooter. He also told the police that two men had fired the shots. He claimed that Summers was standing against the house when she was shot.

Cornelius Scales, age 12, testified that the boys were on the side of the porch at Michael's house when the shots began. According to Scales, the boys then hid under a car behind Michael's house. Scales indicated that Michael was under the car when the shots were fired. Scales did not see anyone leaving a car or walking to Cadillac Bob's house. On cross-examination, Scales indicated that he had forgotten what had occurred at the time of the shooting. His memory had been refreshed by a man in a blue suit who had come to visit his house the day before he testified at trial.

Roger Britt, age 9, testified that while he was with Cornelius and Michael, he saw two men get out of a car and walk through the alley towards Stadium Street. He stated that the boys decided to follow, and when they heard gunshots they ducked behind a car. According to Britt, the boys stayed behind the car until the shots stopped. They then went to the house of a woman who lived next door. Britt said Michael stated that Tyree, an 18-year-old friend of Michael's, had been shot. Michael's mother also testified that when her son returned home he said he thought his friend Tyree had been shot.

Lawrence Medlock, who was standing on the porch of a house on 20th Street, heard a series of gunshots and saw two African-American males running from the direction of the gunshots to a red and white Buick. He believed the gunshots came from Sta-

dium Street. Medlock admitted having had prior burglary, robbery, and theft convictions.

Officer Bobby Wiley found Summers lying with her back against the curb. She was not breathing. He found two piles of shell casings, one in front of Cadillac Bob's house and one to the east of the house. Eighteen shell casings were fired from the same gun. The murder weapon was never found. Bullet fragments recovered from Summers' body and from a wall in the house were compared. The firearms examiner could not conclusively determine that the two shots came from the same gun but he did identify them as coming from the same type of firearm.

Bowen did not testify at trial. In addition to the testimony of two of the boys, Scales and Britt, Bowen introduced evidence that he was with Vincent Curie at Curie's home on Mascot Street from 8:45 p.m. until approximately 9:30 p.m. on January 21, 1992. Curie testified that it would take about 15 to 20 minutes to get from his residence to the area where the shooting occurred. Ron Waits, a private investigator who was Bowen's surrebuttal witness, testified that he drove from Curie's residence to the 2500 block of East 20th Street and took an odometer reading of 2.9 miles. He said the drive took approximately eight and a half minutes.

Bowen's live-in girlfriend testified during the State's rebuttal that she saw Bowen with a man named Brad in a red Cutlass with a white top for a couple of minutes at approximately 8:00 p.m. on the evening of the shooting. She next saw Bowen at home between 10:00 and 11:00 p.m.

The jury found Bowen guilty as charged. Additional relevant facts are set out in the opinion.

### The Motion in Limine

Bowen filed a motion in limine which sought "an Order prohibiting the State from introducing evidence or argument of gang membership" at trial. The trial court used the following language in granting the motion: "Well, the Motion in Limine in regard to any evidence referring to gang membership is sustained. If they open the door, of course, the rule would be that you would be allowed to go into it; at this time it's sustained."

The State called Tito Labra, a deputy sheriff charged with serving warrants. The State proceeded to elicit an explanation

from Labra that he was assigned to the sheriff's gang task force. Counsel approached the bench and an off-the-record discussion occurred between counsel and the judge followed by an off-the-record discussion between the prosecutor and Labra. Questioning by the State resumed and Labra again stated that he had been assigned to the Special Community Action Team (SCAT), a police/sheriff's unit that focuses on drugs and gang activity. Defense counsel again objected to the relevance of the State's line of questioning. Counsel were called to the bench. The prosecutor explained that he wanted to discuss Bowen's arrest by a SCAT member on February 22, 1992. When the court further inquired concerning the testimony's relevance, the prosecutor indicated that he possibly should withhold Labra's testimony until rebuttal. The trial court directed the State to advise the witness that he was "not to go into anything about gangs under any circumstances." Defense counsel requested that the officer's prior testimony be stricken. The trial court denied the request, reasoning as follows: "If I ask him to strike it, it will bring it out even more."

Bowen emphasizes that the State did not, as it had suggested, present Labra as a rebuttal witness. He believes that the State impermissibly intended to "smear" him with the gang reference.

Bowen explains that the trial court, in granting the motion in limine, determined that testimony concerning gang activities would be prejudicial. Consequently, he maintains that the trial court should have stricken Labra's testimony from the record. He notes that the striking of testimony is a recognized method of preventing a defendant from being harmfully prejudiced, citing *State v. Massey*, 242 Kan. 252, 264, 747 P.2d 802 (1987). Bowen observes that in *Massey*, we held that the State's violation of an order in limine constituted reversible error. Bowen contends that absent the striking of the testimony in question, he was subject to substantial injustice.

*Massey* discussed violations of orders in limine. Implicit in *Massey* is a two-part test for evaluating such violations. First, a determination concerning whether there was a violation of the order in limine must be made. Second, if a violation is found, then a determination is to be made as to whether the facts elicited

in violation of the order substantially prejudiced the defendant. 242 Kan. at 265.

In evaluating the alleged violation of the order in limine, the trial court found Labra's testimony did not violate the order— Labra did not link Bowen or Bowen's alleged crime to a gang. The trial court provided a reasonable rationale for refusing to strike the testimony. The grant or denial of a motion to strike affecting the admission or exclusion of evidence subject to the exclusionary rules is a matter of trial court discretion. See *State v. Friberg*, 252 Kan. 141, Syl. ¶ 5, 843 P.2d 218 (1992). The standard of review on whether the trial court abused its discretion is whether no reasonable person would agree with the trial court. *State v. Griffin*, 246 Kan. 320, 326, 787 P.2d 701 (1990). The trial court in the case at bar did not abuse its discretion. Furthermore, under the second part of the evaluation test, even if Labra's testimony violated the order in limine, defendant did not suffer substantial prejudice requiring a mistrial.

Bowen suggests that ill intent is shown by the State's inquiry of Curie, which established that Bowen was from California and that he had attempted to get into his "situation" upon his arrival in Wichita. The State reasons that the fact that Bowen was from California in no way established that he was a gang member. We agree.

Bowen contends that the State's bad faith also is demonstrated by a newspaper article in the Wichita Eagle in which police officers are quoted as calling Bowen a Los Angeles gang "banger" or hit man. According to Bowen, this information reached the press without regard for the order in limine. He reasons that the State's misconduct regarding the order violated his right to due process and a fair trial. The State claims that an order in limine does not prohibit the press from publishing information it acquires concerning a criminal trial. We agree. We find nothing in the record to substantiate any claim of prosecutorial misconduct in connection with the newspaper article.

## Refusal to Grant a Mistrial

The article which appeared in the Wichita Eagle on the second day of trial carried the headline: "Witness fingers gunman/Woman defies threats to testify in friend's slaying." The first sentence

stated: "The murder trial of a 20-year-old man who police say is a Los Angeles gang 'banger,' or hit man, opened Tuesday in Sedgwick County District Court with nervous testimony from an eyewitness who claimed she had been threatened to prevent her from showing up in court."

Bowen accents the fact that there was no evidence presented at trial concerning any such threats against Marcia Redd, the witness referred to in the article. The trial court disallowed testimony of such rumors because they were hearsay.

When the trial resumed the morning the article was published, defense counsel brought it to the trial judge's attention. Counsel requested that the court inquire of the jurors as to whether they had seen or read the article. Counsel also stated that she believed that a mistrial would be in order if any of the jurors had read or seen the article. The trial court agreed to conduct an inquiry.

"THE COURT: Members of the jury, at this time I want to make an inquiry of you to each of you answer—I want you to answer the question. There was an article in the paper about this particular case. Now, did any of you read that article or see that article? If you did please raise your hand.

"MR. LANGE: I saw the article.

"THE COURT: You saw the article?

"MR. LANGE: I realized what it was about and I didn't read it.

"THE COURT: And, Mr. Patrick Robinson, you also saw it?

"MR. ROBINSON: Now, I saw the headline and saw a name and then set it aside.

"THE COURT: Did anyone else see the article or read any of it?

"I see no affirmative answers.

"THE COURT: On the basis of merely seeing the headline of the article, I do not see that that would in any way . . . influence the jury. You can't put blinders on the jurors, and, therefore, I will go ahead with the trial. Is the State ready to proceed?"

The motion for a mistrial was denied. Our standard of review of a trial court's refusal to grant a mistrial under K.S.A. 22-3423 is abuse of discretion. *State v. Pioletti*, 246 Kan. 49, 65, 785 P.2d 963 (1990).

Bowen believes that trial court did not properly characterize the jurors' statements concerning what they had seen. He finds it difficult to understand how one juror could realize what the article was about without reading it. Bowen stresses that the trial court did not determine at what point the juror realized the article

dealt with the trial. Additionally, Bowen notes that the other juror said he read beyond the headline, which indicates to Bowen that the juror passed the gang "banger" language in the first sentence. Bowen also contends that the trial court's inquiry was inadequate because the judge failed to determine whether the offending material would prejudice the two jurors.

Bowen notes that in *State v. Lumbrera*, 252 Kan. 54, Syl. ¶ 6, 845 P.2d 609 (1992), we reasoned that appellate courts have a duty to make an independent evaluation of the circumstances in determining whether a trial court has taken sufficient measures to assure that the accused is tried by an impartial jury free from outside influence. The issue in *Lumbrera* concerned pretrial publicity and voir dire. Bowen discusses *State v. Yurk*, 230 Kan. 516, 638 P.2d 921 (1982). In *Yurk*, one juror had read an article that described the defendant's prior convictions. The *Yurk* juror was asked whether a newspaper article would affect his ability to be fair and impartial. The juror stated initially that his ability to be fair would be affected but under further questioning by the judge stated he could render a fair decision. The juror said, concerning the newspaper article, that "the main thing that bothered me were the other charges that had been filed against the man and the convictions." 230 Kan. at 520. We reversed. Bowen reasons that *Yurk* is analogous to the case at bar.

The trial court in Bowen's case informed the jurors that they "should not read any material that may be in any of the newspapers or listen to any radio announcement or view items on the radio or television concerning this case." The admonition was given at the end of trial the day before the article was published.

The State notes that although defense counsel did raise the issue in a motion for a new trial, no juror affidavits were attached suggesting the extent of knowledge of the article's content or that they were influenced by the news story. The jurors were not produced at hearing on the motion for a new trial. According to the State, defense counsel at the hearing on the motion for a new trial said that she had interviewed one of the two jurors following the trial and found that the juror had read the article after the trial. The State contends that there is nothing in the record to show the juror was influenced at trial by his knowledge of the article.

We have held that "[a] motion to inquire during trial is not a proper method to determine if members of a jury are aware of prejudicial articles published or aired during the trial." *State v. Zimmerman*, 251 Kan. 54, Syl. ¶ 10, 833 P.2d 925 (1992). The trial court's polling of the jury during trial generally is rejected because of the potential for placing prejudicial material before the jury which could form a basis for a mistrial. *State v. Stewart*, 219 Kan. 523, 530, 548 P.2d 787 (1976). The trial court, in the case at bar, did essentially poll the jury to determine who had read the article.

The manner in which the poll was conducted by the trial judge was not prejudicial. The judge inquired as to whether any of the jurors had seen or read the article. If he had continued in the fashion desired by Bowen and asked the jurors whether they were prejudiced by the article, prejudicial error might have occurred. Such a prolonged inquiry could have caused jurors to focus on the article and wonder whether they should, in fact, have had their opinions altered by its content. In *Yurk*, we observed:

"No objection to the procedure followed by the trial court has been raised by either party although the polling of the jury during trial was contrary to our holdings in *State v. Smith*, 215 Kan. 34, 523 P.2d 691 (1974), and *State v. Potts*, 205 Kan. 42, 468 P.2d 74 (1970). It is quite possible that the actual polling of the jury may have aroused the curiosity of the other jurors and created further prejudice to the defendant." 230 Kan. at 523.

See *State v. Richard*, 252 Kan. 872, 850 P.2d 844 (1993).

The fact that a juror has read a newspaper article does not automatically constitute grounds for a mistrial. *Roy v. State*, 213 Kan. 30, Syl. ¶ 2, 514 P.2d 832 (1973). The two jurors in the instant case who saw the single article in question did not indicate that they had read it in its entirety. The content of the offending headlines is not of such a nature that prejudice should be presumed. Bowen had the burden to demonstrate that he was prejudiced. *Pioletti*, 246 Kan. at 65. We find no abuse of discretion in the trial court's refusal to grant a mistrial.

### Limitation of Cross-Examination

The following exchange occurred between defense counsel and Marcia Redd, an eyewitness, near the end of cross-examination:

[DEFENSE COUNSEL]: "Well, isn't it a fact that you were granted probation on April 28, 1992?

[MARCIA REDD]: "It doesn't have anything to do with it.

"[PROSECUTOR]: Your Honor, I will object to that. May I approach the bench?

"THE COURT: Yes, you may.

"(An off-the-record discussion was had between the Court and Counsel, after which the following proceedings were had:)

"THE COURT: Members of the jury, the question and the answer is stricken from the record."

The following occurred on redirect:

[PROSECUTOR]: "Q. I think Ms. Roberts' [defense counsel's] last question to you that wasn't stricken was were you given anything in exchange for your testimony?

[WITNESS, MARCIA REDD]: "A. Sure wasn't."

Bowen reasons that the Confrontation Clause of the Sixth Amendment affords the accused the right of cross-examination. He asserts that the exposure of a witness' motivation in testifying is a proper and important function of cross-examination, citing *State v. Humphrey*, 252 Kan. 6, 17, 845 P.2d 592 (1992). We agree. We determined in *Humphrey* that it was reversible error for the trial court to prevent defense counsel from questioning a prosecution witness concerning her "relationship with the police." 252 Kan. at 17.

According to Bowen, Redd's status of being on probation created a relationship with the State. He asserts that a person on probation would be loath to do anything that could be displeasing to the authorities and reasons that Redd may have been eager to please the State. Redd received probation in connection with an unrelated possession of cocaine charge. Bowen contends that the inquiry concerning Redd's probationary status should have been permitted. He claims he was denied his right to confront and cross-examine the witness.

The State argues there was no abuse of discretion because Redd did not enter into any agreement with the State. The State emphasizes the fact that Redd testified on cross-examination and on redirect that she did not receive anything in exchange for her testimony. According to the State, she was granted probation by the court, not the State, following her conviction for possession of cocaine. Bowen failed to make any proffer indicating that one

of the conditions of Redd's probation was that she would testify for the State in the case at bar. Furthermore, there was no indication that Redd's probation was jeopardized because she was a witness in the instant case. Redd was never a suspect in connection with the murder.

In *Humphrey*, 252 Kan. 6, the witness in question was solicited by Humphrey to engage in criminal conduct. The possibility that the police could have influenced the witness by initiating criminal charges against her if she failed to cooperate was present. Consequently, the witness' relationship with the police was a ripe area for cross-examination. By contrast, in the case at bar, there was no such relationship to explore. Revocation of Redd's probation could be effected only upon a showing that she had violated the conditions of her probation.

In *Davis v. Alaska*, 415 U.S. 308, 39 L. Ed. 2d 347, 94 S. Ct. 1105 (1974), the prosecution was granted a protective order to prevent any reference, in the course of cross-examination, to the juvenile record of a crucial prosecution witness, Richard Green. In opposing the protective order, Davis' counsel made it clear that he would not introduce Green's juvenile adjudication as a general impeachment of his character as a truthful person but, rather, to show specifically that at the same time Green was assisting the police in identifying Davis, he was on probation for burglary. Green made a photographic identification of Davis as one of the men he had encountered the day before and, two days later, picked Davis out of a lineup of seven African-American males. Davis sought to prove that Green acted out of fear or concern of possible jeopardy to his probation. Davis reasoned that Green may have made a hasty and faulty identification to shift suspicion away from himself as the one who committed the burglary. 415 U.S. at 310-11. The Supreme Court held that the trial court should not have granted the motion for a protective order and reversed the convictions and remanded the case.

*Davis* endorses a defendant's right to cross-examine a witness to expose bias and prejudice. However, the Court's emphasis on the critical nature of Green's testimony suggests that if testimony is not necessary for conviction, its restriction will not constitute a denial of effective cross-examination.

In *Delaware v. Van Arsdall*, 475 U.S. 673, 89 L. Ed. 2d 674, 106 S. Ct. 1431 (1986), a prosecution witness had received a dismissal of a public drunkenness charge after he agreed to speak with the prosecution about the murder allegedly committed by Van Arsdall. At trial, Van Arsdall was denied the right to cross-examine the witness concerning the dismissal of the charge. 475 U.S. at 676. Van Arsdall asserted that *Davis* foreclosed the application of a harmless error analysis to the Confrontation Clause violation. The *Van Arsdall* Court interpreted *Davis* as not establishing a categorical exception to the harmless error rule. 475 U.S. at 682-83.

The cross-examination should have been permitted in the case at bar. The error, however, was harmless. Our harmless error standard of review requires us to declare, beyond a reasonable doubt, that the error had little if any likelihood of changing the result of the trial. *State v. White*, 246 Kan. 28, 37, 785 P.2d 950 (1990). See *Chapman v. California*, 386 U.S. 18, 23-24, 17 L. Ed. 2d. 705, 87 S. Ct. 824, *reh. denied* 386 U.S. 987 (1967). Redd's identification of Bowen was corroborated by a second eyewitness, Michael Calhoun, and by physical evidence. Kent McCray observed someone shooting from the area described by Redd. Shell casings were found in the area from which Redd testified shots were fired. Lawrence Medlock saw two men run from the sound of the gunshots and get into a red and white car. Redd saw a red and white car shortly before the shooting. Redd's testimony concerning what she had observed was explored on cross-examination, and the jury was instructed on eyewitness identification. Redd was asked on cross-examination whether she was given anything in exchange for her testimony.

## An Instruction on Involuntary Manslaughter

Bowen requested an instruction on involuntary manslaughter. The written instruction he proposed advanced the theory that he unintentionally killed Summers while committing the crime of criminal damage to property, McCray's car, in a wanton manner. At the commencement of the instructions conference, the trial court stated it was not going to give any of the defendant's proposed instructions. Bowen believes that this error entitles him to a new trial on the homicide count.

The trial court indicated it would give its proposed instruction on involuntary manslaughter premised on the theory that the unintentional killing occurred while Bowen unlawfully discharged a firearm in a wanton manner (Instruction No. 15).

Defense counsel neither objected as the instruction was being read to the jury nor noted error following closing arguments, despite the fact an error in another instruction was noted by the judge and corrected at that point. After the jury was excused to commence its deliberations, the following record was made:

"[PROSECUTOR]: The last thing we have not put on the record is Instruction No. 15. We checked over the language now and as it reads now concerning unlawful discharge of a firearm.

"[PROSECUTOR]: No objection by the State.

"[DEFENSE COUNSEL]: No objection.

"[PROSECUTOR]: And No. 16 which is now the elements of unlawful discharge of a firearm.

"[PROSECUTOR]: No objection by the State.

"[DEFENSE COUNSEL]: No objection by the defense."

We find no error in the instruction given.

### Sufficiency of the Evidence

Bowen contends that the testimony of two eyewitnesses who allegedly identified him as the gunman was so incredible that the conviction should not be allowed to stand.

The standard of review when sufficiency of the evidence is questioned on appeal is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Graham*, 247 Kan. 388, Syl. ¶ 5, 799 P.2d 1003 (1990).

The jury exercises the prerogative to determine the credibility of the witnesses, the weight to be given the evidence, and the reasonable inferences which may be drawn from the evidence. *State v. Pondexter*, 234 Kan. 208, 215, 671 P.2d 539 (1983). There was sufficient evidence from which the jury could conclude that Bowen was the person who fired the shots which killed Summers and injured McCray.

Affirmed.

LOCKETT and ALLEGRUCCI, JJ., dissenting.