No. 68,778

STATE OF KANSAS, *Appellee,* v. DARIN T. MAYS, *Appellant.*

(866 P.2d 1037)

Opinion filed January 21, 1994.

*Steven R. Zinn,* deputy appellate defender, argued the cause, and *Jessica R. Kunen,* chief appellate defender, was with him on the brief for appellant.

*Michael A. Russell,* assistant district attorney, argued the cause, and *Nick A. Tomasic,* district attorney, and *Robert T. Stephan,* attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

DAVIS, J.: The defendant, Darin Mays, appeals his convictions of rape and aggravated robbery. He contends that the court denied him the right to present evidence in support of his theory of defense. The defendant further contends that the court erred by failing to instruct on eyewitness identification. We need not address the defendant's second contention because the exclusion of evidence under the facts of this case resulted in the denial of a fair trial. Accordingly, for the reasons expressed, we reverse and remand for a new trial.

R.J. was staying with her boyfriend, Tyrone Dillard, at a motel in Kansas City, while their house was being exterminated. She testified that while alone in their room about 3:00 p.m. her uncle, Jerry Robinson, came into the room, claiming that her boyfriend told him to come by and borrow about $25. She testified that her uncle stated that he would return later to pick up the money.

Soon after Robinson left, R.J. said she responded to a knock on the door, looked out, and saw the defendant. She recognized the defendant as "Dolemite" because she had seen him on the streets "a couple of times" a year or more before that date. She testified that she did not "run around" with the defendant and had never conversed with him but that he "hung around" with her cousins and others she knew.

R.J. testified that she let the defendant in and that as soon as she had closed the door he pulled a handgun, pointed it at her head, and told her he wanted everything she had. She testified that after she gave the defendant about $100, he told her to sit on the bed, started searching the room, and told her that if he found anything else he would kill her.

According to R.J., the defendant then returned to the bed and told her to take off all of her clothes. When she failed to respond quickly, he "started yanking them." She testified that the defendant then fondled her breasts and inserted his fingers into her vagina. The defendant then yanked the telephone out of the wall and left, taking with him the money and her boyfriend's diamond ring, which the defendant saw on the counter as he was leaving.

R.J. dressed and left the room. Tyrone Dillard drove up as she was on her way to the front office to call him for help in reporting the crime to the police. Dillard drove her to the police station, where she reported the crime. Detective Wohlforth showed R.J. six photos, from which she identified the defendant. Detective Wohlforth testified that no one assisted her in making the identification and that R.J. had no doubt that she had correctly identified the man who had raped and robbed her.

Dillard testified that as he was pulling into the motel parking lot, he saw R.J.'s uncle, Jerry Robinson, and a man known as Horse driving away in a blue Chrysler automobile. Dillard had seen the defendant with Robinson and Horse earlier that day in

the same car but did not see the defendant with Robinson and Horse as they left the motel in the car.

Officer Thebo testified that he processed the telephone for fingerprints. He was unable to identify any prints as those of the defendant. Detective Wohlforth testified that he interviewed R.J. and Dillard separately. R.J. was upset and "trying real hard to hold back the tears." According to Wohlforth's testimony, R.J. described to him the same series of events that she described to the jury. R.J. told Wohlforth that the perpetrator's name was Dolemite. Another detective told Wohlforth that Dolemite was known to him as Darin Mays. Officer Wohlforth placed the defendant's photo in a photographic lineup with five other photographs and displayed them in random order to R.J. She looked at all of the photos and identified the defendant.

Jerry Robinson testified on behalf of the defendant. He denied seeing R.J. or being in her room, and he denied that he asked to borrow money. The defendant's mother and his cousin, Jan Brooks, testified that the defendant was at his residence the entire day of the incident and never left the residence. The defendant also testified that he was at his residence that day and never did see R.J. or Dillard on the day of the incident.

The jury found the defendant guilty of both counts, and he was sentenced to 15 years to life for each count, the terms to be served concurrently.

The State's case was based upon the testimony of R.J. No physical evidence linking the defendant to the offense was presented, with perhaps the exception of testimony as to the clothes the defendant was wearing. The State claims that the defendant's witness, Jan Brooks, corroborated R.J.'s testimony about the clothes the defendant was wearing. Yet, there was some variance, and Jan Brooks' recollection was not that complete. When Tyrone Dillard returned to the motel room, he saw a car in which there were three people, including Robinson and Horse. Dillard did not see the defendant at that time. About two minutes after the car left, R.J. walked up and said she had been robbed and sexually assaulted. As a practical matter, the State's case rested exlusively upon R.J.'s testimony.

It is against this backdrop that we examine the first allegation of error. The defendant contends that the trial court denied him

the right to present evidence in support of his theory of defense because it precluded him from testifying regarding a prior altercation with Dillard and from cross-examining R.J. regarding her financial dependence upon Dillard.

According to the defendant, he did not know whether the rape and robbery occurred. It was his theory that R.J. was lying either about the incident or about who raped and robbed her. According to the defendant's theory, R.J. lied because Dillard and the defendant had been engaged in an ongoing feud concerning money that the defendant had gambled away, money that belonged to Dillard. Based upon their relationship and upon the fact that Dillard provided financial support for R.J., the defendant contended that she lied to help Dillard carry out the vendetta he allegedly had against the defendant.

Perhaps the best way to illustrate what evidence was excluded by the trial court, the significance of the evidence as it related to the defendant's theory, and the basis upon which the court excluded the evidence is to quote directly from the record.

The following exchange occurred during the cross-examination of R.J.:

"Q. [MR. REED, defense counsel] Ms. [R.J.], do you work for a living?
"A. No.
"Q. And who provides your support?
"MR. RUSSELL [prosecution]: Object. May we approach the bench?
"THE COURT: Very well.
"(The following proceedings were had at the bench by Court and counsel out of the hearing of the jury:)
"MR. RUSSELL: Judge, I would object to any of this as it's irrelevant as to what happened on that day and how she makes a living. I don't know where he's going with this, but if he's trying to prove she came through money through drugs or something, that has no relevance. As to whether or not a robbery took place—does not have anything to do with where the money came from or anything.
"MR. REED: Your Honor, if I may, if I can try to establish a basis of relevancy, the point of my inquiry is it goes to one of credibility, because my client is going to argue that Mr. Dillard is involved in the drug trade. The reason why they made these charges against him is because he double-crossed her boyfriend, Tyrone Dillard, who provides her support.
"THE COURT: At this point in time, I see no reason of what she does for a living or how she makes a living to be brought into the charges. I'll sustain the objection."

The following exchange took place during the defense counsel's cross-examination of Tyrone Dillard:

"(The following proceedings were had at the bench by Court and counsel out of the hearing of the jury.)

"MR. REED: Your Honor, I thought it would be wise to ask for a cite now. But on the question now of credibility, I want to elicit some testimony concerning the ongoing feud between Mr. Dillard and Mr. Mays concerning some stolen money, and I'd like to be able to ask those questions.

"MR. RUSSELL: Judge, under 60-422, that deals with credibility of a witness and it says you can only cross-examine a witness about prior instances of crimes involving dishonesty or fraud. And if he's going to lead up to about drugs, that has no—that is not a crime that deals with dishonesty or fraud, and under 60-422, does not allow it and I would object . . ., and number two, that's inadmissible evidence.

. . . .

"THE COURT: Tell me exactly what it is you want to get into.

"MR. REED: Well, Your Honor, my client's—my client's allegation is that because of some prior business transactions between him and Mr. Dillard that a motive which created, you know, for his testimony and the reason why these charges have been brought against him, my client would, you know, testify when it comes his turn to testify that he misapplied some funds that were lent to him by Mr. Dillard and a substantial sum of money, and that for this reason that he [Dillard] has a vendetta, if you want to call it, against—against Mr. Mays. What I want to do is try to elicit this before the jury is to show that apart from the fact that he's the boyfriend of Ms. [R.J.], that he may perhaps have some other motives to appear here to testify as he has.

"THE COURT: When you say 'other motives', are you saying that because of this gentleman's relationship financially with your client that [R.J.] is lying?

"MR. REED: Well, that—yeah, that's basically my client's argument.

"THE COURT: Mr. Dillard has the power over the young lady to make her lie, then, or—

"MR. REED: That's already been made by my client.

"THE COURT: Tell me about this—when did this economic situation develop?

"MR. REED: What time was that you got the money?

"MR. MAYS: I don't remember when, it was before the incident, you know, about the beginning of June or the end of May and he give me some money to get some—

"MR. REED: About a thousand dollars?

"MR. MAYS: Yes, some money to get something for him and I lost the money gambling. And I was going to try to pay him back, but I had got laid off at the time and he got a little upset about it, you know, and I wasn't working. I told him I'd get paid, I was going to draw unemployment

to pay him back. He didn't want that, so we got into it at a club one night and we got into a little fight, and he states that he would get even with me somehow, you know. And come after June 18th, a few weeks later, I had a warrant out for my arrest for this aggravated robbery and rape against his girlfriend.

"MR. REED: So again, your Honor, to recapitulate, my client's argument is that Mr. Dillard does have that influence over his girlfriend and that this is his means of getting even for that shorting him on that business transaction.

"THE COURT: Mr. Russell?

"MR. RUSSELL: Judge, when we went through the first sideboard on the first witness, I heard the term 'drug use' up there, and now they're talking about a transaction and I don't know if they're talking about drugs or not. I mean we're outside the hearing of the jury if that's what they're arguing, that has no relevance at all. I mean, number one, you cannot cross-examine someone about drugs because it's not a crime that involves dishonesty or fraud. As to if they're not using the term 'drugs' and they want to use the term 'transaction', that somehow this witness has some type of control over a victim to make the story she has, I don't think there's been any showing by this defendant that there's any relevance to that other than it's a made-up story.

"THE COURT: I agree with what most of you would say, but if this witness would have an interest in the outcome of this case, any interest that may be as to the defendant, would be relevant for credibility purposes.

"MR. REED: So again, Your Honor, I think it's relevant not only to— not so much her testimony to a lesser extent because she's a third person, but mostly to his credibility as a witness.

"MR. RUSSELL: Well, now we're straying from that. If they're going to tie it in say now he's got control over the woman . . .—as prior bad acts, I don't see that as a prior bad act or specific instance or conduct. If there's any probative value, it's outweighed by the undue prejudice.

"MR. REED: Again, Your Honor, the point of this testimony I want to elicit is not to show that Mr. Dillard is a bad person, but simply to show that in this specific instance, this case that we have before us, there is a motive to develop the testimony which he has offered, and I think it goes directly to the issue of credibility because I think this shows that he is not a dispassionate observer apart from the fact that she is his girlfriend."

The court allowed defense counsel to inquire as to the loan transaction. Tyrone Dillard testified that he never loaned money to the defendant and never got into a feud with the defendant. Dillard also testified that four months prior to the incident at issue here, the defendant and Jerry Robinson robbed Dillard. Dillard stated that he reported it to the police but denied that he ever made a statement he would get even with the defendant.

On redirect, Dillard testified that he did not influence R.J. in her identification of the defendant in this case and that the police brought them back into the office separately.

Finally, while the defendant was testifying on direct examination, the following exchange took place:

"Q. (By Mr. Reed) Mr. Mays, in the months preceding June 18th, did you have any contacts with Mr. Dillard?

"A. Not around June the 18th. Before then I did.

"Q. And when was that?

"A. I think it was probably beginning of the year, somewhere like that.

"Q. Beginning of 1991?

"A. Yeah, somewhere like January or February I seen him at a club and we had got into it.

"Q. Can you tell the jury about what happened there?

"MR. RUSSELL: Judge, I would object to any of this. This is irrelevant.

"MR. REED: Your Honor, I think given this goes to the—perhaps the Court wants a bench conference on this—but I think this goes directly to the issue of the credibility of the prosecution witness. This isn't a matter of collateral impeachment, I think this goes directly—

"THE COURT: Approach the bench.

"(The following proceedings were had at the bench by Court and counsel out of the hearing of the jury:)

"THE COURT: I guess what bothers me, I'm not sure it's ever been shown that the guy has that much control over the woman, and the guy's testimony is he didn't have anything to do with this crime. It's her testimony, and there's nothing been shown that she has a reason or an interest in this to lie, so—

"MR. REED: But one of my arguments that I'm going to make during closing is that perhaps what inference he had would suggest in her mind that if she had any problems with identification, perhaps his power of suggestion helped her to identify Mr. Mays as her attacker.

"MR. RUSSELL: Judge, the evidence in this case has been that there was a photo lineup. He's testified that she didn't see him and she picked him out of a lineup. His name does not appear on that photo anywhere. How is it that he could tell her to pick out any person when there's no name there and she's never seen him?

"THE COURT: I'm going to sustain the objection."

Evidence concerning the financial dependence of R.J. upon her boyfriend, Tyrone Dillard, was material, relevant, and admissible. Evidence concerning a feud and fight between the defendant and Dillard, as well as Dillard's alleged statement that he would get even with the defendant, was material, relevant, and admissible. Relevant evidence is defined as "evidence having any tendency

in reason to prove any material fact." K.S.A. 60-401(b). See *State v. Baker*, 219 Kan. 854, Syl. ¶¶ 1, 2, 4, 549 P.2d 911 (1976).

While a formal proffer by defense counsel was not made in each instance, the court, based upon side bar conferences with counsel, was aware of the information to be elicited and the reasons why such information was important to the defendant's theory of his defense. The defendant himself, in one of the conferences outside the presence of the jury, explained to the court that Tyrone Dillard said to him after a fight over money at a local bar that he was going to get even with the defendant. We are satisfied that the record meets the requirements that the defendant make a proffer of the excluded evidence, for the record demonstrates the nature of the excluded evidence and the significance of that evidence to the defendant's case.

Immediately after the incident, R.J. dressed and left the room to contact Dillard for help in reporting the rape and robbery to the police. She met Dillard, and he drove her to the police station. The evidence demonstrates that while she was not acquainted with the defendant she could recognize him from seeing him at other times before the incident. She testified that she recognized him as "Dolemite."

The only evidence supporting the defendant's convictions was the testimony of R.J. If the jury believed her testimony, it necessarily would convict the defendant. At the same time the jury necessarily would reject the testimony of the defendant and his alibi witnesses. Evidence bearing upon the credibility of R.J. was key to and an integral part of the defendant's defense.

In *State v. Bradley*, 223 Kan. 710, Syl. ¶ 2, 576 P.2d 647 (1978), we said: "A defendant is entitled to present the theory of his defense. The exclusion of evidence, which is an integral part of the theory of defense, violates the defendant's fundamental right to a fair trial."

In *Bradley*, the defendant raised self-defense in a case where the victim entered the room in an intoxicated condition and fired a shot at the defendant, with the bullet striking the mattress near the defendant's head. The defendant jumped up and struggled with the victim, resulting in the victim's death. 223 Kan. at 712.

The victim knew the defendant and, before coming into the room, learned that the defendant was a police informant who

might turn the victim in for an earlier offense the victim had committed. The defendant sought to establish that fear of being reported to the authorities was the reason the victim attacked the defendant. The court excluded this evidence by ruling in limine that such evidence was evidence of bad character and inadmissible. 223 Kan. at 713. We agreed that the evidence was properly excluded as evidence of bad character by the trial court. Yet, in *Bradley*, we held that the defendant

"had a right to present his theory of defense. He had the right to introduce into evidence what he believed was the motive and intent of the deceased for what he claimed was an attack by the deceased upon his person. This was an integral part of his claim of self-defense or justifiable homicide. It is fundamental to a fair trial to allow the accused to present his version of the events so that the jury may properly weigh the evidence and reach its verdict. The right to present one's theory of defense is absolute." 223 Kan. at 713-14.

In addition to his alibi defense, the defendant's theory was that the alleged victim, R.J., had a motive to lie about the rape and robbery itself or who committed the rape and robbery. Her motive was to please her boyfriend, who supported her and had told the defendant within the past year that he would get even with the defendant.

We have no way of knowing what impact this evidence may have had upon the jury. We do know that the defendant's conviction depends upon the testimony of R.J. We are not prepared to conclude that the exclusion of evidence bearing upon the credibility of the main witness against the defendant in a case where no physical evidence connected the defendant to the crime scene was harmless error.

The exclusion of relevant, admissible, noncumulative evidence bearing upon the credibility of a critical prosecution witness unfairly prejudiced the defendant. The exclusion of evidence in this case is similar to the exclusion that occurred in *State v. Davis*, 237 Kan. 155, 159, 697 P.2d 1321 (1985). Just as in *Davis*, the evidence excluded herein was admissible and related to the credibility of a critical witness against the defendant. In *Davis*, as here, we reversed and remanded for a new trial.

In *State v. Humphrey*, 252 Kan. 6, Syl. ¶ 3, 845 P.2d 592 (1992), we said: "It is fundamental to a fair trial that the accused

be afforded the opportunity to present his or her defense to the charge so the jury may properly weigh the evidence and reach its verdict." We further recognized in *Humphrey* that

"[t]he Confrontation Clause of the Sixth Amendment affords an accused the right to cross-examination. The United States Supreme Court has 'recognized that the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross- examination.' *Davis v. Alaska*, 415 U.S. 308, 316-17, 39 L. Ed. 2d 347, 94 S. Ct. 1105 (1974)." 252 Kan. at 17.

The trial court in this case prevented the defendant from cross-examining both R.J. and Tyrone Dillard involving matters attacking the credibility of the only witness providing any evidence against him. The court further excluded evidence offered on direct examination by the defendant concerning an ongoing feud between the defendant and Dillard. The court excluded evidence that was an integral part of the theory of the defense. The exclusion violated the defendant's fundamental right to a fair trial. See *State v. Gonzales*, 245 Kan. 691, 783 P.2d 1239 (1989). Accordingly, we reverse and remand for a new trial.

Reversed and remanded for a new trial.