No. 69,288

STATE OF KANSAS, *Appellee*, v. KENNETH LEE MORRIS, *Appellant*.

(880 P.2d 1244)

Opinion filed September 16, 1994.

*Rick Kittel*, assistant appellate defender,argued the cause, and *Jessica R. Kunen*, chief appellate defender, was with him on the brief for appellant.

*Frank D. Diehl*, assistant district attorney, argued the cause, and *Gerald E. Wells*, district attorney, and *Robert T. Stephan*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

LOCKETT, J.: Defendant Kenneth Morris appeals his convictions on one count each of first-degree murder and aggravated burglary, claiming the district court erred in: (1) failing to suppress his confession; (2) failing to allow the defense to admit certain evidence; (3) improperly responding to a jury question; (4)

giving an erroneous instruction on eyewitness identification; and (5) failing to give an instruction on a lesser crime.

James Turner and his friend Danny Davis went out together on the night of August 7, 1991. During the time they were together, Davis drank quite a bit. At about 1:45 a.m. they returned to Davis' Lawrence residence. Davis had forgotten his key. A man and a woman approached and began talking to Davis. Turner could not positively identify Kenneth Morris as the man in question, but he testified there was a resemblance. After the two people left, Davis entered the house through a basement window.

Joseph Whitten was living with Davis and Albert Mauk. Whitten knew Morris and had previously allowed Morris and Morris' wife to stay overnight at the residence. Morris had also been to the house a few other times. Whitten had spent the night of August 7, 1991, at a friend's house. When Whitten arrived home at approximately 12:15 p.m., he heard a wheezing sound and went to see what it was. He found Davis lying on the bed, seriously injured. Whitten went to a neighbor's and called for an ambulance. Medical personnel subsequently transported Davis to the hospital.

When Davis was brought to the hospital, he had a skull fracture and several open deep cuts on his hand. Davis continued to deteriorate and later died from the head wounds. The autopsy of Davis' body revealed, in addition to the head wounds, a variety of bruises on both sides of the arms and legs. There had been five separate blows to his head, which had caused internal injuries to the brain. The medical examiner testified these blows could have been caused by a golf club.

The crime scene was processed. Some of the windows were unlocked. One of the basement windows was open, and its screen was setting outside the house. There were no signs of forced entry. A set of scales belonging to Davis was missing from the house. There appeared to be blood, tissue, or some hair on the head of a golf club found on the bed with Davis. Eighty-seven fingerprints were lifted from various items found at the crime scene, but none were sufficient for an identification. A pair of Morris' jeans was later tested, and blood found on the jeans, as well as on the golf

club, was consistent with Davis' genetic blood markers. The golf club was part of a set owned by Mauk.

On August 16, 1991, nine days after the attack on Davis, Morris was arrested in Phoenix by Detective Michael Smith, a Phoenix, Arizona, police officer, for committing several recent burglaries in Phoenix. At the police station, Morris initially told Smith he was Lee Hall. When officers explained they were going to fingerprint him, Morris gave his real name and informed the officers that he had a Kansas probation violation warrant outstanding. The Arizona police informed the Kansas authorities that Morris had been arrested in Arizona. Smith then received a phone call from Sergeant Crossfield of the Lawrence, Kansas, police department. Crossfield told Smith he was going to fly down to Phoenix to talk to Morris about a murder investigation. Crossfield did not say Morris was a suspect.

After talking to the Kansas authorities, Smith returned to question Morris. Smith informed Morris that he had been arrested because Morris was suspected of committing burglaries and thefts in Phoenix. Smith gave Morris the *Miranda* warnings. When asked by Smith, "Do you understand these rights?", Morris replied, "I'm not sure what I want to do." Although Morris did not specifically state he understood the rights, Smith believed that Morris did understand them. But because of Morris' answer, Smith was unsure whether Morris had invoked his Fifth Amendment right to remain silent, and Smith did not ask any more questions. Without being asked additional questions, Morris was transported to the county jail. Detective Smith could not remember if, during the ride to the county jail, Morris asked when an attorney would be appointed to represent him for the Arizona charges. During the booking process, Morris did not request a lawyer.

Smith could not remember whether the Lawrence police detectives had asked Morris prior to interviewing him if he had previously been *Mirandized* or had an attorney appointed. After the Kansas officers informed Morris of the crime under investigation in Kansas and his rights under *Miranda*, Morris made incriminating statements. Morris was subsequently returned to Kansas and charged with the felony murder of Davis and aggravated burglary.

Prior to trial, Morris moved to suppress his confession and any evidence obtained as fruit of that confession. He alleged violations of his right to remain silent under the Fifth and Sixth Amendments of the United States Constitution and § 10 of the Kansas Constitution Bill of Rights. That motion was denied. Morris was tried and convicted of first-degree murder and aggravated burglary. Morris now appeals those convictions.

*Failure to Suppress Confession*

Morris makes several separate arguments as to why his confession should not have been admitted into evidence. Morris first asserts his confession should be suppressed because the State failed to show his confession was voluntary. He claims that his statement was not voluntary because the interview lasted five hours; during the interview he was questioned about two separate deaths; there were promises and threats made to induce his statement; he became ill at one point; he had only limited access to communication with the outside world; voices were raised in the discussion; he was homeless; he was 28 years old; and he was addicted to drugs at the time of the interview.

At the suppression hearing, Detective Smith, who had arrested Morris in Phoenix, testified as to what had occurred in Arizona. Detective Crossfield then testified that while investigating the murder of Davis, he was informed that Morris was in custody in Phoenix. Crossfield called Smith in Arizona and told Smith that Morris was a suspect in the homicide. Crossfield interviewed Morris in Phoenix the morning of August 17, 1991. No criminal charges had been filed against Morris in Kansas. When Crossfield gave Morris the *Miranda* warnings, Morris said that he understood his rights and waived his right to remain silent. Crossfield stated the Kansas officers never discussed the Arizona charges with Morris or knew Morris had an Arizona attorney appointed for him. During the interview, Morris never asked for an attorney, nor did he invoke his right to remain silent.

Crossfield testified that Morris stated that he and his wife had gone to Davis' residence to purchase some cocaine but no one was there. Eventually Davis and another man drove up. Morris purchased cocaine from the other person. Morris later discovered

he had received baking powder instead of cocaine. Morris and his wife returned to Davis' place to get their money back. When no one answered the door, Morris entered Davis' house through a bedroom window, took some loose coins and a set of scales, and gave them to his wife.

Morris reentered the house and picked up a golf club. Morris discovered Davis asleep in a bedroom. Morris stated he was mad at Davis because Davis had betrayed him in the drug deal and had previously "messed around" with Morris' wife. Morris said he struck Davis several times with the golf club. Morris left the house and had a friend take him and his wife to the bus station. After giving the statement to Crossfield, Morris wrote a letter to his wife and asked the officers to give it to her. The letter stated Morris had told the officers what had happened and informed his wife she would not to go to jail if she told the truth. The letter instructed the wife to give the scales that Morris had taken from Davis' place to the officers.

Crossfield then testified that Morris indicated he did not want a detainer from Arizona while serving time in Kansas; he was willing to waive extradition to Kansas if the Arizona charges were dropped. Crossfield denied discussing the death penalty with Morris or telling Morris he was "damn lucky that they don't kill people in Kansas anymore." Two days later, Crossfield again interviewed Morris. After being given the *Miranda* warnings, Morris did not ask for an attorney or invoke his right to remain silent, and made a second statement.

Morris testified that when he was interviewed by the Kansas officers, he informed them that he had a court-appointed attorney on his Arizona charges. Morris admitted that he had voluntarily talked to Crossfield and understood that he could quit talking at any time. Morris stated he told Crossfield he had purchased some bad drugs at Davis' residence but did not want to discuss the drug related matters because he was afraid he would be labeled a snitch and be at risk when placed in the prison population.

Morris claimed Crossfield threatened him by stating he could get a "snitch jacket" placed on Morris whether Morris cooperated or not. Morris stated that Crossfield told him he was going to jail

for first-degree murder and that he was lucky Kansas did not have the death penalty. When Morris asked if that was a threat, Crossfield replied it was a promise. Morris said Crossfield then told how Crossfield, at age 17, had singlehandedly whipped three grown men in a barroom fight. Morris took that as a threat of physical violence against him.

Morris stated he attempted to terminate the interview, but Crossfield kept asking questions. After a break, Crossfield again brought up the Davis case. Morris stated, "I thought we were done with that." Shanks, the other Kansas officer, responded, "Not quite." Morris testified that Crossfield then began asking questions about the death of Randy Smith, a friend of Morris'. Morris asked Crossfield if he thought Morris had killed Smith. Crossfield said no. Morris replied: "You're damn right I didn't kill him. . . . You police mother fuckers are the ones that killed him." Morris then testified Crossfield started screaming that he had never killed anybody and he knew it was Morris who had killed Davis.

Morris testified Crossfield then offered a series of scenarios of how Morris' wife could have been involved in the killing of Davis and threatened to charge his wife unless Morris confessed. Crossfield also promised Morris that if he would cooperate, Crossfield would talk to the prosecutor about reducing the first-degree murder charge. Morris claimed that during the five-hour interview he told Crossfield at least four times that he wanted the interview to stop. Morris stated that he continued to answer questions because he felt threatened.

The judge found that when interviewed in Arizona, although Morris had an attorney appointed to represent him for the Arizona burglary charges, Morris did not inform the Kansas officers that he had been appointed counsel for the Arizona charges. The Kansas officers were not aware counsel had been appointed to represent Morris on the Arizona criminal charges. The judge determined that Morris understood his *Miranda* rights and voluntarily agreed to talk to the Kansas officers. The judge found that although the interview lasted about five hours, Morris never requested that the interview be terminated. The judge noted the

room where the interview took place was about 6 feet by 18 feet with a 5- or 6-foot-long table. During the interview, Morris was given the opportunity to take breaks, use the restroom, smoke cigarettes, and eat lunch. The judge found there were no threats or promises made by the Kansas officers. The judge determined that any comments made by the officers about applying a snitch jacket, barroom fights, death penalty, or striking deals with the prosecutor either did not occur or occurred in a different context and time than Morris claimed. The judge concluded the confession was voluntary and admissible.

*Voluntariness*

The first question for this court to determine is whether there is substantial competent evidence to support the district judge's finding that the confession was voluntary. In determining whether a confession is voluntary, a court is to look at the totality of the circumstances. The burden of proving that a confession or admission is admissible is on the prosecution, and the required proof is by a preponderance of the evidence. Factors bearing on the voluntariness of a statement by an accused include the duration and manner of the interrogation; the ability of the accused on request to communicate with the outside world; the accused's age, intellect, and background; and the fairness of the officers in conducting the interrogation. The essential inquiry in determining the voluntariness of a statement is whether the statement was the product of the free and independent will of the accused. *State v. Price*, 247 Kan. 100, Syl. ¶ 1, 795 P.2d 57 (1990). When a trial court conducts a full hearing on the admissibility of an extrajudicial statement by an accused, determines the statement was freely and voluntarily given, and admits the statement into evidence at the trial, an appellate court accepts that determination if it is supported by substantial competent evidence. See *State v. Johnson*, 253 Kan. 75, 83-84, 853 P.2d 34 (1993).

Although the interview took place over five hours, it occurred during the daytime, breaks were allowed, Morris apparently never requested to communicate with "the outside world," and the detectives' testimony indicated the interview was conducted fairly. The other factors cited by Morris, *e.g.*, his homelessness or the

alleged promises or threats made to induce the confession, either are immaterial or contradicted by testimony of the detectives. Morris was in his twenties, and there is no indication his intellect was of a level that militates against finding he made a voluntary confession of his own free will. Despite Morris' protestations, when the totality of the circumstances is considered, there is clearly substantial competent evidence to support the district court's finding Morris' confession was made freely and by his independent will.

*Request for Counsel*

Morris asserts that even if his statement was voluntary, it was not admissible as evidence because he had invoked his Fifth Amendment right to remain silent by exercising his Sixth Amendment right to counsel when questioned as to the Arizona charges. See, *e.g., Edwards v. Arizona,* 451 U.S. 477, 485, 68 L. Ed. 2d 378, 101 S. Ct. 1880 (1981). Morris claims his response to Detective Smith, "I'm not sure what I want to do," when asked if he understood his rights, constituted an invocation of his right to counsel. Morris concludes that because he had invoked his Sixth Amendment right to counsel, the subsequent waiver of his Fifth Amendment right to remain silent, when questioned by the Lawrence detectives, was invalid. The State contends that the defendant's comment "I'm not sure what I want to do" is too equivocal to be an invocation of the defendant's Fifth and Sixth Amendment rights.

We have stated that when a suspect makes a statement which may be ambiguous as to whether the suspect is asserting a right to remain silent or to confer with counsel, the interrogator may ask questions to clarify whether the suspect is asserting a right to remain silent or to confer with counsel. *State v. Fritschen,* 247 Kan. 592, Syl. ¶ 4, 802 P.2d 558 (1990). In *Fritschen,* the defendant, while in custody, stated, "I don't want to talk about [the homicide] any more, it hurts too much." 247 Kan. at 606. This court held that statement was not an ambiguous request to remain silent. It noted that after that statement by the defendant, the defendant was told he had a right to counsel, he was free to leave, and the officers would take him home. When the officers asked

if Fritschen wanted to continue talking, Fritschen agreed to continue the interview. The *Fritschen* court concluded that under the facts, a reasonable person in the defendant's situation would not believe he or she was in custody; therefore, the confession was voluntary and admissible.

In *State v. Ninci*, 19 Kan. App. 2d 192, 865 P.2d 1078 (1993), *rev. denied* 254 Kan. 1009 (1994), the Court of Appeals limited the scope of an investigator's questioning of a suspect who makes an ambiguous, indecisive, or equivocal request for counsel during an interrogation. In *Ninci*, the defendant was being interviewed regarding a murder. After being given *Miranda* warnings, the defendant admitted that he was present when the homicide took place. Ninci was requested to sign a consent form to search his house. He was informed that if he did not consent the officers would obtain a search warrant. The defendant stated, "I don't know, do I need to have a lawyer right now?" 19 Kan. App. 2d at 194. The officer did not answer the defendant, continued the interview, obtained the consent, searched the defendant's home, and seized incriminating evidence. Ninci filed a motion to suppress his statements and all evidence seized via the search warrant. Ninci claimed the evidence was obtained through a violation of his *Miranda* rights. The district court granted the defendant's motion to suppress. The State appealed the order to suppress.

The *Ninci* court, after reviewing *Fritschen* and relying on several federal appellate court decisions, determined that if a suspect makes an ambiguous, indecisive, or equivocal request for counsel during an interrogation, all interrogation must immediately cease, with the exception of further questions designed to clarify whether the suspect desires to consult with an attorney before continuing the interrogation. It stated that such questioning must be limited to the subject of clarification and cannot be used as a means of eliciting any incriminating statements from the suspect relating to the subject matter of the interrogation. 19 Kan. App. 2d 192, Syl. ¶ 2. The *Ninci* court determined that if a suspect makes an ambiguous, indecisive, or equivocal request for counsel during interrogation, failure of the interrogating authorities to

clarify whether the suspect's desire to consult with an attorney before resuming the interrogation renders that portion of a suspect's statement, taken after such request was made, inadmissible. 19 Kan. App. 2d 192, Syl. ¶ 3. It found that a suspect's alleged request for counsel must be given a broad interpretation in favor of the right to counsel when the suspect's words, understood as ordinary people would understand them, are ambiguous. 19 Kan. App. 2d 192, Syl. ¶ 4. The *Ninci* court ruled that whether a statement made by a suspect during interrogation was an ambiguous, indecisive, or equivocal request for counsel is a question of fact to be resolved by the trial court from a totality of the evidence presented and affirmed the district court. 19 Kan. App. 2d 192, Syl. ¶ 1.

Subsequent to oral argument in this case, the United States Supreme Court ruled on this issue in *Davis v. United States*, 512 U.S. ____, 129 L. Ed. 2d 362, 114 S. Ct. 2350 (1994). Davis, a member of the United States Navy, was a suspect in the murder of another sailor. Davis initially waived his rights to remain silent and to counsel during an interview by Naval Investigative Service agents. Approximately an hour and a half into the interview, Davis said, "Maybe I should talk to a lawyer." 129 L. Ed. 2d at 368. The agents inquired if Davis was requesting counsel. Davis said he was not. The agents took a short break, reminded Davis again of his rights, and continued to interview Davis for another hour. At that time, Davis asked to have a lawyer present before he said anything else. Questioning ceased. Davis moved to have the statement suppressed. A military judge subsequently denied a motion to suppress statements, holding that Davis' statement was not a request for counsel. Davis was convicted of murder.

In affirming Davis' conviction, the United States Supreme Court noted a suspect is entitled to the assistance of counsel during custodial interrogation even though the Constitution does not provide for such assistance. 129 L. Ed. 2d at 373. If the suspect invokes that right at any time, the police must immediately cease questioning the suspect until an attorney is present. *Edwards v. Arizona*, 451 U.S. 477, 484-485. It noted that the *Edwards* rule serves the prophylactic purpose of preventing officers from badg-

ering a suspect into waiving the suspect's previously asserted *Miranda* rights and requires courts to determine whether the accused actually invoked the right to counsel. The test to determine if a suspect is asserting *Miranda* rights under *Edwards* is an objective inquiry, requiring some statement that can reasonably be construed to be an expression of a desire for an attorney's assistance. However, if a reference is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel, *Edwards* does not require that officers stop questioning the suspect. The United States Supreme Court determined that extending *Edwards* to create such a requirement would transform the *Miranda* safeguards into wholly irrational obstacles to legitimate investigative activity by needlessly preventing the police from questioning a suspect in the absence of an attorney, even if the suspect does not wish to have one present. The *Edwards* rule was formulated to provide a bright line that can be applied by officers in the real world of investigation and interrogation without unduly hampering the gathering of information. The clarity and ease of application of *Edwards* would be lost if officers were required to cease questioning based on an ambiguous or equivocal reference to an attorney, since they would be forced to make difficult judgment calls about what the suspect wants, with the threat of suppression if they guessed wrong. The Court found that while it will often be good police practice for officers to clarify whether a suspect making an ambiguous statement really wants an attorney, they are not required to ask clarifying questions. *Davis*, 129 L. Ed. 2d at 373. It concluded that after a knowing and voluntary waiver of rights under *Miranda* law enforcement officers may continue questioning until and unless a suspect clearly requests an attorney.

The Arizona police officer testified he was unsure whether Morris was requesting counsel, but he did not believe that the defendant was invoking his Fifth Amendment right. The officer did not follow up with any inquiry to clarify Morris' comment. *Davis* and *Fritschen* both permit and encourage officers to ask questions to clarify whether a suspect is asserting his rights. *Davis*,

129 L. Ed. 2d at 373; *Fritschen,* 247 Kan. at 607. While further questions by Detective Smith could have cleared up the matter, the rule adopted in *Davis* prefers clarification but does not require it.

Morris' statement, "I'm not sure what I want to do," was not an invocation of any particular right, let alone a complete invocation of all rights. The admission of the statement was not barred by the Fifth or Sixth Amendments to the United States Constitution. In light of *Davis* and our holding in this case, syllabus ¶¶ 2, 3, and 4 of *Ninci* and the corresponding statements in the opinion are overruled.

Morris next contends the district judge improperly admitted the confession under *McNeil v. Wisconsin,* 501 U.S. 171, 115 L. Ed. 2d 158, 111 S. Ct. 2204 (1991), which involved the Sixth Amendment right to an attorney, not the Fifth Amendment right to remain silent. In *McNeil,* the defendant was charged with armed robbery. He was represented by a public defender at the bail hearing. While in custody on that charge, he was questioned by police from another jurisdiction about a murder and related crimes committed in the other jurisdiction. He was advised of his *Miranda* rights, signed waivers, and subsequently made incriminating statements regarding the murder. McNeil was then charged with the murder and related crimes. McNeil's pretrial motion to suppress his statements was denied, and he was convicted of the charges. McNeil appealed to the state supreme court, and his conviction was affirmed. The United States Supreme Court accepted review of the case and noted that the question presented was whether the accused's invocation of his Sixth Amendment right to an attorney during a judicial proceeding on the armed robbery charge constituted an invocation of his Fifth Amendment right to counsel for the murder charge in the other jurisdiction. It noted that the Sixth Amendment provides that in all criminal prosecutions, the accused shall enjoy the right to have the assistance of counsel for the accused's defense. In *Michigan v. Jackson,* 475 U.S. 625, 89 L. Ed. 2d 631, 106 S. Ct. 1404 (1986), the United States Supreme Court had held that once the right to counsel has attached and has been invoked, any subse-

quent waiver during a police-initiated custodial interview is ineffective. It was undisputed in *McNeil* that at the time McNeil provided the incriminating statements regarding the murder charge, his Sixth Amendment right had attached and had been invoked with respect to the armed robbery, for which he had been formally charged.

The Supreme Court noted that the Sixth Amendment right, however, is offense specific. It observed that the Sixth Amendment right cannot be invoked once for all future prosecutions, for it does not attach until a prosecution is commenced, that is, " 'at or after the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.' " *United States v. Gouveia*, 467 U.S. 180, 188, 81 L. Ed. 2d 146, 104 S. Ct. 2292 (1984) (quoting *Kirby v. Illinois*, 406 U.S. 682, 689, 32 L. Ed. 2d 411, 92 S. Ct. 1877 [1972]). And just as the right is offense specific, so also the *Michigan v. Jackson* effect of invalidating subsequent waivers in police-initiated interviews is offense specific.

The *McNeil* court observed that in *Edwards v. Arizona*, 451 U.S. 477, the Supreme Court had established a second layer of prophylaxis for the *Miranda* right to counsel: Once a suspect asserts the right, not only must the current interrogation cease, but "the suspect may not be approached for further interrogation until counsel has been made available," 451 U.S., at 484-85, which meant that counsel for the suspect must be present. See *Minnick v. Mississippi*, 498 U.S. 146, 112 L. Ed. 2d 489, 111 S. Ct. 486 (1990). If the police subsequently initiate an encounter in the absence of counsel, assuming there has been no break in custody, the suspect's statements are presumed involuntary and therefore inadmissible as substantive evidence at trial, even where the suspect executes a waiver and the suspect's statements would be considered voluntary under traditional standards. This is "designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights." *Michigan v. Harvey*, 494 U.S. 344, 350, 108 L. Ed. 2d 293, 110 S. Ct. 1176 (1990). The *Edwards* rule, moreover, is *not* offense specific: Once a suspect invokes the *Miranda* right to counsel for interrogation regarding

one offense, the suspect may not be reapproached regarding *any* offense unless counsel is present. *Arizona v. Roberson*, 486 U.S. 675, 100 L. Ed. 2d 704, 108 S. Ct. 2093 (1988).

Having described the nature and effects of both the Sixth Amendment right to counsel and the *Miranda-Edwards* "Fifth Amendment" right to counsel, the Supreme Court then discussed the issue presented by McNeil. It observed that the petitioner sought to prevail by combining the two rights. McNeil contended that, although he expressly waived his *Miranda* right to counsel on every occasion he was interrogated, those waivers were the invalid product of impermissible approaches because his prior invocation of the offense specific Sixth Amendment right with regard to the first set of charges was also an invocation of the non-offense specific *Miranda-Edwards* right. The *McNeil* court opined, "We think that [contention] is false as a matter of fact and inadvisable (if even permissible) as a contrary-to-fact presumption of policy." 501 U.S. at 177.

Morris had counsel appointed for him on the Arizona charges. Under *McNeil*, Morris' Sixth Amendment right to counsel during formal judicial proceedings, which is offense specific, did not prevent interrogation outside the presence of counsel for crimes unrelated to the charges for which counsel had been appointed. See 501 U.S. at 178-79. Morris argues that *McNeil*, however, is inapposite because he claims he invoked both his Fifth and Sixth Amendment rights to counsel when questioned by the Arizona officers. Morris asserts that although the right to counsel under the Sixth Amendment is "offense specific," see *McNeil*, 501 U.S. at 175, once a Fifth Amendment right to counsel had been invoked, he may not be questioned by the Kansas officers unless counsel is present. See *Michigan v. Jackson*, 475 U.S. at 626; *State v. Norris*, 244 Kan. 326, 331, 768 P.2d 296 (1989).

The flaw in Morris' argument is that he never invoked his right to counsel or his right to remain silent. Appointment of counsel on the Arizona burglary charges was offense specific and did not prevent the detectives from questioning Morris on unrelated matters. Morris' equivocal comment to the Arizona officer was not an invocation of his right to counsel; therefore, the waiver of his right to remain silent was valid.

Morris recognizes that the United States Supreme Court in *McNeil* rejected a combination of the right to counsel in custodial interrogations under the Fifth Amendment with the right to counsel during formal judicial proceedings under the Sixth Amendment. 501 U.S. at 177-78. Morris, however, points out that § 10 of the Kansas Constitution Bill of Rights, unlike the federal Constitution, combines the Fifth and Sixth Amendment rights to counsel in one provision. He asserts that because the rights are combined, the two provisions are to be treated together and equally. Morris argues that combining the rights to counsel in § 10 of the Kansas Constitution Bill of Rights "rejects the offense-specific distinction" of *McNeil* and extends to the accused more protection than the federal Constitution.

We disagree with Morris' assertion. The Fifth Amendment right to counsel stems from language in that provision that states "nor shall any person . . . be compelled in any criminal case to be a witness against himself." The Sixth Amendment provides that in all criminal prosecutions the accused shall have the assistance of counsel in defending against the charges brought. We recognize § 10 of the Kansas Constitution Bill of Rights combines several protections found in the Fifth and Sixth amendments into one provision. It states:

"In all prosecutions, the accused shall be allowed to appear and defend in person, or by counsel [Sixth Amendment]; to demand the nature and cause of the accusation against him [Sixth Amendment]; to meet the witness face to face, and to have compulsory process to compel the attendance of the witnesses in his behalf [Sixth Amendment], and a speedy public trial by an impartial jury of the county or district in which the offense is alleged to have been committed [Sixth Amendment]. No person shall be a witness against himself [Fifth Amendment], or be twice put in jeopardy for the same offense [Fifth Amendment]."

The double jeopardy provisions of the federal and Kansas Constitutions have previously been held by this court to be co-equal. *In re Habeas Corpus Petition of Lucas*, 246 Kan. 486, 489, 789 P.2d 1157 (1990). ("Section 10 of the Bill of Rights of the Kansas Constitution entitles a defendant to the same protection against double jeopardy afforded under the United States Constitution.") Other provisions in the Kansas Constitution Bill of Rights have also been held to extend the same or similar protection as the

analogous federal bill of rights provisions. See, *e.g., State ex rel. Tomasic v. City of Kansas City,* 237 Kan. 572, 583, 701 P.2d 1314 (1985) (section 1 of the Kansas Constitution Bill of Rights is given much the same effect as the Equal Protection Clause of the Fourteenth Amendment).

In *State v. Schultz,* 252 Kan. 819, 824, 850 P.2d 818 (1993), we noted that the scope of § 15 of the Bill of Rights to the Kansas Constitution and of the Fourth Amendment to the United States Constitution is identical or is usually identical. The State was investigating Schultz' purchasing of surplus property. The State subpoenaed his bank and telephone records. Schultz filed a motion to suppress the use of the records, claiming he had a legitimate expectation of privacy in information he voluntarily turned over to a third party, the bank. The trial court denied the defendant's motion, determining that the defendant had no reasonable expectation of privacy in bank records. The *Schultz* court found that the Fourth Amendment to the United States Constitution does not prohibit the government's obtaining information revealed to a third party and conveyed by that third party to government authorities, even if the information is revealed to the third party on the assumption that it will be used only for a limited purpose and that the confidence placed in the third party will not be betrayed. We noted that "this court has never extended state constitutional protections beyond federal guarantees." 252 Kan. at 826. Although the *Schultz* court elected not to extend the protection afforded under the state constitution past the reach of the federal Constitution, it did not foreclose extending state constitutional protection in a later case involving different issues. 252 Kan. at 834. The *Schultz* court noted that Schultz had offered "intriguing reasons" for expanding protection afforded defendants based on the state constitution, including interpreting § 15 in light of both of the other provisions of the Kansas Bill of Rights and of our state's constitutional and common-law history. 252 Kan. at 826, 834. However, we declined to expand the protection.

To support his claim, Morris also cites a variety of cases from other jurisdictions where other states have relied on state constitutional grounds in deciding right to counsel issues. Some of

the cases cited do not support Morris' argument, either through co-equal treatment of state and federal constitutional provisions, or relying on state common law or evidentiary law to avoid the otherwise controlling effect of United States Supreme Court constitutional edicts, or due to material differences in wording between the federal and state constitutions. In light of this court's decision in *Schultz*, what other states choose to do is not sufficiently persuasive to cause us to apply those cases to this matter.

This court is free to construe our state constitutional provisions independent of federal interpretation of corresponding federal constitutional provisions. See *Oregon v. Hass*, 420 U.S. 714, 719, 43 L. Ed. 2d 570, 95 S. Ct. 1215 (1975). In *Hass*, the United States Supreme Court recognized that a state is free as a matter of its own law to impose greater restrictions on police activity than those the Court holds to be necessary upon federal constitutional standards. See *Schultz*, 252 Kan. at 824. The provisions of § 10 of the Kansas Constitution Bill of Rights grant no greater protection against self-incrimination than is afforded by the Fifth Amendment to the United States Constitution. The manifest purpose of the constitutional provisions, both state and federal, is to prohibit the compelling of self-incriminating testimonial or communicative acts from a party or a witness. The liberal construction which must be placed upon constitutional provisions for the protection of personal rights requires that the constitutional guaranties, however differently worded, should have as far as possible the same interpretation. *State v. Faidley*, 202 Kan. 517, 520, 450 P.2d 20 (1969). Morris offers no compelling reason to expand protection afforded defendants, instead relying only on the fact that the state constitution combines protection contained in two separate amendments to the federal Constitution.

*Refusal to Admit Evidence*

In the State's opening argument, the prosecutor indicated that Morris' incriminating statements made during the interview would be introduced into evidence. The defense counsel, in his opening remarks, countered that when the jury took into account the evidence of the confession, it would also have evidence of Arizona

"court documents" that would show Morris had counsel appointed the night prior to the interview.

Crossfield admitted on cross-examination that before they interviewed Morris the Lawrence police officers were "concerned" whether Morris had been to court on the Arizona charges and had not determined if Morris had an attorney appointed. During the cross-examination of Shanks, Morris' counsel attempted to introduce into evidence an order from the Arizona court showing counsel had been appointed to represent Morris on the Arizona crimes prior to the interview. The State objected to admission of the order on hearsay grounds and also because the Arizona court order might mislead the jury into believing counsel had been appointed to represent Morris for the Kansas murder investigation prior to the interview. The trial judge ruled that evidence was not relevant and that its introduction would confuse the jury. The trial judge then ordered that the jury was not to be informed of the fact that Morris was in custody on the burglary charges in Arizona because of its prejudicial effect.

It is fundamental to a fair trial that the accused be afforded the opportunity to present his or her defense to the charge so the jury may properly weigh the evidence and reach its verdict. *State v. Humphrey*, 252 Kan. 6, Syl. ¶ 3, 845 P.2d 592 (1992). Morris contends this district court's attempt to insure that the jury did not become aware of the fact that Morris was in custody on burglary charges at the time of the interview is misplaced because from other testimony adduced it was "quite apparent" the jury was aware Morris had been in some type of criminal trouble in Arizona. He argues the exclusion of the Arizona court order deprived him of his right to a meaningful opportunity to present a complete defense. He asserts that if the jury had seen the order it would have demonstrated the testimony of Shanks and Crossfield regarding Morris' confession was unreliable and that Morris' confession was coerced.

The State notes that under K.S.A. 22-3215(5), once a court has ruled a confession is admissible, the admissibility of that confession will not be submitted to the jury. The State acknowledges a defendant may still introduce evidence that bears on the weight

to be given the confession. The State contends the evidence in question goes solely to the issue of the Sixth Amendment right to counsel and therefore the admissibility of the confession and not the weight to be given to the confession itself.

The admissibility of evidence is governed by its relevancy to the issue in question. *State v. Reynolds*, 230 Kan. 532, Syl. ¶ 4, 639 P.2d 461 (1982). Relevant evidence is evidence having any tendency in reason to prove any material fact. K.S.A. 60-401(b). The determination of relevancy is a matter of logic and experience, not a matter of law. *State v. Steadman*, 253 Kan. 297, 305, 855 P.2d 919 (1993). Admission or exclusion of evidence is within the sound discretion of the trial court, subject to exclusionary rules. *State v. Friberg*, 252 Kan. 141, 147, 843 P.2d 218 (1992). If the statement or confession is voluntary, the credibility of the witnesses and the weight to be given to the statement are left to the province of the jury and should be submitted at the trial. The trial judge has discretion in determining relevancy and should keep the inquiry within the proper bounds. *State v. Duncan*, 221 Kan. 714, 720-21, 562 P.2d 84 (1977). If reasonable people could differ about the propriety of the trial court's decision, this court will not find that the trial court abused its discretion. *State v. Cromwell*, 253 Kan. 495, 511, 856 P.2d 1299 (1993). .

Review of the admission or the exclusion of evidence is governed by K.S.A. 60-261, the harmless error rule, which provides that no error in either the admission or the exclusion of evidence by the court is a ground for granting a new trial or for setting aside a verdict unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties. *State v. Getz*, 250 Kan. 560, 569, 830 P.2d 5 (1992).

Two recent cases discussed a defendant's claim that the trial judge improperly excluded relevant evidence. In *State v. Getz*, the defendant was charged with theft of two horses. Getz stated that when she returned home one day she discovered the horses on her property. Getz claimed that Patton, who was living with her, informed her he had purchased the horses and had asked

her to sell the horses for him. Patton disappeared prior to trial and could not be located. Because Patton was not available to testify, the trial judge found Patton's statements to Getz were hearsay and refused to allow Getz to testify that Patton had told her he had purchased the horses and wanted her to sell them for him. The *Getz* court found that the evidence had been improperly excluded, noting that the jury could have concluded that Getz did not intend to permanently deprive the true owner of the horses. It observed that without the intent to permanently deprive the owner of the property, Getz could not be guilty of theft. It reversed the conviction, finding that the erroneous exclusion of the evidence was not harmless error.

In *State v. Mays*, 254 Kan. 479, 487-88, 866 P.2d 1037 (1994), the victim claimed that Mays, whom she knew, raped and robbed her while armed with a handgun. Mays did not deny the victim was raped. He claimed the victim named him as the offender at the urging of her boyfriend because of their feud over money that belonged to the boyfriend that Mays had lost gambling. The excluded evidence in *Mays* included testimony about a witness' financial dependence on her boyfriend and that boyfriend's threat to "get even" with the defendant. 254 Kan. at 485. The *Mays* court noted that the only evidence supporting the defendant's conviction was the witness' testimony and that the evidence bearing on her credibility was "an integral part of the defendant's defense." 254 Kan. at 486. It noted that the exclusion of relevant, admissible, noncumulative evidence bearing upon the credibility of a critical prosecution witness can unfairly prejudice the defendant and determined that the exclusion of that evidence violated Mays' right to a fair trial.

The issue of the admissibility of a confession or admission shall not be submitted to the jury. The circumstances surrounding the making of a confession or admission may be submitted to the jury as bearing upon the credibility or the weight to be given to the confession or admission. K.S.A. 22-3215(5).

In both *Getz* and *Mays,* the excluded evidence was relevant. Here, the offered evidence was not relevant. Morris' purpose in adducing the evidence was to impeach the credibility of the de-

tectives' testimony regarding Morris' inculpatory statements. The evidence excluded would have only established Morris had counsel appointed for him on the Arizona burglary charges. The detectives did not testify that Morris did not have counsel already appointed; instead, they testified they were unaware that counsel had been appointed. The Arizona court document would not contradict the detectives' claim that they were unaware of the appointment of counsel for Morris. It would not tend to prove or disprove any material fact; therefore, it was not relevant.

*Response to Jury Question During Deliberations*

The jury was instructed that to find Morris guilty of aggravated burglary, it had to find that Morris had knowingly entered into and remained in the residence without authority and with the intent to commit theft and that there was a human being in the residence at that time. During the deliberations, the jury sent out a written question that read:

"On Page 7 ('The defendant is charged with aggravated burglary. . .'

"Item 4, that there was a human being . . . etc.

"A question has been raised by a juror that to meet this criteria, did the defendant need to know someone was in the house when he entered, or did someone simply have to be in the house? Can you advise us on this?"

Over Morris' objection, the court answered:

"Knowledge of the presence of another human being in the structure is not an element of the charge of aggravated burglary. Please refer to instruction number 7, element 4."

Morris does not argue that the response was incorrect, only that the judge's response was unnecessary because the existing instructions adequately explained the relevant law. He does not clearly state how the trial judge's giving this answer to a jury's request is an abuse of discretion. The State argues that under *State v. Bandt,* 219 Kan. 816, 549 P.2d 936 (1979), the trial court had a "positive duty" to respond to the jury and, even absent that duty, the response given was within the discretion of the court.

The important consideration is that the jury be properly instructed on the essential issues presented at the trial, and this is particularly true in a criminal proceeding when the question pre-

sented by the jury involves the basic elements of the criminal offense on which the defendant is being tried. *Bandt,* 219 Kan. at 824. Whether to respond to requests for additional information or instructions after a jury has commenced deliberation is addressed to the trial court's discretion. *State v. Sully,* 219 Kan. 222, 228, 547 P.2d 344 (1976); *State v. Thomas,* 6 Kan. App. 2d 925, 932, 636 P.2d 807 (1981). If reasonable people could differ about the propriety of the trial court's decision, this court will not find that the trial court abused its discretion. *Cromwell,* 253 Kan. at 511.

K.S.A. 1993 Supp. 21-3716 provides a more severe offense, aggravated burglary, where the burglary is committed in a structure in which there is some human being. In *State v. Mogenson,* 10 Kan. App. 2d 470, 475, 701 P.2d 1339, *rev. denied* 238 Kan. 878 (1985), the Court of Appeals noted that although the aggravated burglary statute requires knowing entry into a building, etc., it does not mention knowledge in connection with the element that "there is some human being" present. K.S.A. 1993 Supp. 21-3716. Neither party cites a case that discusses whether aggravated burglary requires knowledge that a person is inside the building. In *State v. Price,* 215 Kan. 718, 721, 529 P.2d 85 (1974), this court commented that, clearly, knowledge of entry and intent to commit a theft or a felony is required by the statute, but there is no requirement of knowledge that there was someone within the building at the time the entry was made. See *State v. Lora,* 213 Kan. 184, 515 P.2d 1086 (1973) (evidence of unauthorized entering and remaining in a building that is unoccupied, which later becomes occupied, is sufficient to support an aggravated burglary charge).

The additional instruction in the present case was a correct statement of law and within the court's discretion to give. No error occurred on this ground.

*Eyewitness Instruction*

The jury was given the following instruction on eyewitness identification:

"The law places the burden upon the state to identify the defendant. The law does not require the defendant to prove he has been wrongly identified. In

weighing the reliability of eyewitness identification testimony you should first determine whether any of the following factors existed and if so the extent to which they would affect accuracy of identification by an eyewitness. Factors you may consider are:

1. The opportunity the witness had to observe. This includes any physical condition which could affect the ability of the witness to observe, the length of time of observation, and any limitations on observation like an obstruction or poor lighting.
2. The emotional state of the witness at the time including that which might be caused by the use of a weapon or threat of violence.
3. Whether the witness had observed the defendant on earlier occasions.
4. Whether a significant amount of time elapsed between the crime charged and any later identification.
5. Whether the witness ever failed to identify the defendant or made any inconsistent identification.
6. The degree of certainty demonstrated by the witness at the time of any identification of the accused.
7. Whether there are any other circumstances that may have affected the accuracy of the eyewitness identification."

Morris did not object to the giving of this instruction. No party may assign as error the giving or failure to give an instruction unless he or she objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he or she objects and the grounds for the objection, unless the instruction is clearly erroneous. K.S.A. 22-3414(3). An instruction is clearly erroneous when the reviewing court reaches a firm conviction that if the trial error had not occurred there was a real possibility that the jury would have returned a different verdict. *State v. Johnson,* 253 Kan. 75, 91-92, 853 P.2d 34 (1993).

Morris recognizes the instruction follows PIK Crim. 3d 52.20 and that there was no objection to giving the instruction. He notes that the giving of an eyewitness instruction, where the identification by the eyewitness is a critical part of the State's case, has been recommended by this court in *State v. Warren,* 230 Kan. 385, 397, 635 P.2d 1236 (1981), but he contends that in this case the eyewitness identification was not critical to the State's case. He asserts the giving of the instruction "could create an incorrect impression that there actually was some witness to the killing, or that a witness had identified Mr. Morris as the killer." He argues

this was clear error, and in light of the other alleged errors in this case, requires a reversal of the conviction.

The State notes this court in *State v. Shepherd*, 232 Kan. 614, 617, 657 P.2d 1112 (1983), stated the giving of the instruction as contemplated by the *Warren* decision was a discretionary decision by the trial judge. It contends the giving of the instruction was not error, to suggest it could have misled the jury is "inane," and that in any event it was not clearly erroneous.

The State's eyewitness, James Turner, did not identify Morris as the person Turner saw talking to Davis. Turner testified that Morris resembled the person. The giving of the instruction did not suggest there was an eyewitness to the killing. The jury was aware that Turner only saw a person·resembling Morris talking to Davis, at which point the person left and Davis entered the house through a basement window. Giving this instruction was within the trial court's discretion. Under such circumstances, there was no abuse of discretion in giving the instruction, and it was certainly not clearly erroneous.

*Lesser Included Offense*

Morris' final complaint is that the trial judge failed to follow his statutory duty to instruct the jury on criminal trespass as a lesser included offense of aggravated burglary. See K.S.A. 21-3107(3). Morris notes that whether criminal trespass is a lesser included offense of aggravated burglary is the subject of opposite conclusions by separate Court of Appeals panels in *State v. Ponds*, 18 Kan. App. 2d 231, 850 P.2d 280 (1993) (Judges Elliott, Brazil, and Adrian J. Allen, District Judge Retired, assigned, finding it is a lesser included offense), and *State v. Rush*, 18 Kan. App. 2d 694, 859 P.2d 387 (1993) (Chief Judge Briscoe, Judge Brazil, and Judge Rulon, finding it is not, with Judge Brazil dissenting based on the opinion in *Ponds*). Morris mistakenly asserts *Ponds* is controlling.

The conflict between the Court of Appeals decisions in *Ponds* and *Rush* was resolved by this court in *State v. Rush*, 255 Kan. 672, 877 P.2d 386 (1994). The *Rush* court noted that the issue is not whether there was sufficient evidence to support a conviction of the claimed lesser included offense. The question is

whether criminal trespass is necessarily proved if the crime of aggravated burglary is proved. The *Rush* court determined criminal trespass is not a lesser included offense of burglary under K.S.A. 21-3107(2)(d) because criminal trespass requires proof of something more than knowing and unauthorized entry or remaining within property; criminal trespass also requires proof of actual or constructive notice. It concluded that the legislature's 1980 amendments to what is now K.S.A. 1993 Supp. 21-3721 provided an additional method for proving constructive notice. The *Rush* court found that *State v. Williams*, 220 Kan. 610, 556 P.2d 184 (1976), correctly concludes that criminal trespass is not a lesser included offense of burglary.

The trial court did not have a duty under K.S.A. 21-3107(3) to instruct the jury on criminal trespass as a lesser included offense of aggravated burglary.

Affirmed.